**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GENBAND US LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:14-cv-33-JRG |
| METASWITCH NETWORKS LTD; | § | |
| METASWITCH NETWORKS CORP., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the motion filed by Defendants Metaswitch Networks Ltd. and Metaswitch Networks Corp. (collectively, "Metaswitch"), styled Metaswitch's Rule 50(b) Renewed Motion for Judgment as a Matter of Law on Liability and Invalidity (Dkt. No. 537). For the reasons set forth below, the motion is **DENIED** in all respects.

I.      BACKGROUND ................................................................................................. 3

II.     APPLICABLE LAW .......................................................................................... 3

        A.    Applicable Law Regarding Fed. R. Civ. P. 50 ....................................... 3

        B.    Applicable Law Regarding Infringement ............................................... 5

        C.    Applicable Law Regarding Validity ....................................................... 5

III.    ANALYSIS ........................................................................................................ 6

        A.    Judgment as a Matter of Law as to Non-Infringement of the Patents-In-
              Suit ......................................................................................................... 6

              1)    Infringement of the '658 Patent ................................................. 6

              2)    Infringement of the '561 Patent ............................................... 13

              3)    Infringement of the '427 and '984 Patents ............................... 18

              4)    Infringement of the '971 Patent ............................................... 23

              5)    Infringement of the '279 and '589 Patents ............................... 26

              6)    Induced infringement ................................................................ 31

        B.    Judgment as a Matter of Law as to Invalidity of the '561, '971, '279, and
              '589 Patents ........................................................................................... 33

              1)    Invalidity of the '561 Patent under §§ 102 and 103 in view of the
                    Kuthan and Mercer references .................................................. 33

              2)    Invalidity of the '971 Patent under § 102 in light of Cisco's Open
                    Packet Telephony ("Cisco OPT") ............................................. 35

              3)    Invalidity of the '279/'589 Patents under § 102 in light of Lucent's
                    MMCX System (MMCX) and Bayer ........................................ 39

IV.     CONCLUSION ............................................................................................... 44

# I. BACKGROUND

The Court held a jury trial in this case and the jury returned a unanimous verdict on January 16, 2016. The asserted claims of United States Patent Nos. 6,791,971 ("'971 Patent"), 6,885,658 ("'658 Patent"), 6,934,279 ("'279 Patent"), 7,995,589 ("'589 Patent"), 7,047,561 ("'561 Patent"), 7,184,427 ("'427 Patent") (collectively, the "patents-in-suit") relate to telecommunications, such as communications over an Internet Protocol network, in particular Voice over Internet Protocol ("VoIP"). The jury returned a verdict that the asserted claims were infringed and not invalid, and it awarded $8,168,400 in damages to Plaintiff Genband for Metaswitch's infringement of the patent claims. ("Verdict," Dkt. No. 465.)

Metaswitch now asserts that, the jury did not have sufficient evidence for its findings. Metaswitch contends that Genband did not present sufficient evidence to support the jury's finding of infringement of each of the asserted patents. Additionally, Metaswitch alleges that the asserted claims of the '561, '971, and '279/'589 Patents are invalid as a matter of law under 35 U.S.C. §§ 102 and 103 in light of prior art that the jury considered.

Having considered the parties' briefing, arguments, and the entire record, the Court is persuaded that Genband introduced substantial evidence that is more than adequate to support the jury's verdict as to infringement and validity.

## II. APPLICABLE LAW

### A. Applicable Law Regarding Fed. R. Civ. P. 50

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." Fed. R. Civ. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a

motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden* 393 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

**B.**     **Applicable Law Regarding Infringement**

To prove infringement under 35 U.S.C. § 271, a plaintiff must show the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

**C.**     **Applicable Law Regarding Validity**

An issued patent is presumed valid. 35 U.S.C. § 282; *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012). Metaswitch has the burden to show by clear and convincing evidence that the asserted claims were anticipated by or obvious over the prior art. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). To prevail on judgment as a matter of law, moreover, Metaswitch must show that no reasonable jury would have a legally sufficient evidentiary basis to find for the Plaintiff. Fed. R. Civ. P. 50. "Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled

artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'' *In re Cyclobenzaprine Hydrochoride*, 676 F.3d 1063 (Fed. Cir. 2012) (internal quotation marks omitted).

## III. ANALYSIS

### A. Judgment as a Matter of Law as to Non-Infringement of the Patents-In-Suit

The jury rendered a unanimous verdict of infringement as to each of the asserted claims regarding each of the patents-in-suit. (Verdict.) Metaswitch argues that Genband bore the burden of proving infringement by proof of each limitation of each asserted claim of each asserted patent, but that Genband clearly failed to meet its burden and that the jury verdict of infringement should not be upheld. (Dkt. No. 537, "JMOL," at 1.) The Court takes up the non-infringement arguments for each patent in turn.

#### 1) Infringement of the '658 Patent

First, Metaswitch argues that the Court should enter judgment of non-infringement as a matter of law because no jury could have found that Metaswitch infringed the asserted claims 1 and 11 of the '658 Patent. (JMOL at 1.) Metaswitch challenges the verdict with regard to the '658 Patent on three grounds. First, Metaswitch argues that Genband did not present sufficient evidence regarding the "without alteration" limitation of Claim 1. Next, Metaswitch argues that Genband did not present sufficient evidence regarding the "media capabilities description" limitation of Claim 11. Finally, Metaswitch argues that Genband did not present evidence of *actual* performance of each and every limitation of Claim 11, which is a method claim. The Court will address each argument in turn.

i.  *The "without alteration" limitation of Claim 1*

Genband alleged that Metaswitch performed each of the limitations of independent Claim

1 of the '658 Patent, which reads as follows:

> 1. A call server comprising:
>
> (a) a fist protocol agent for communicating with a first internet protocol (IP) telephony device according to a first IP telephony protocol;
>
> (b) a second protocol agent for communicating with a second IP telephony device according to a second IP telephony protocol; and
>
> (c) an interworking agent for providing functions usable by the first and second protocol agents to communicate with each other according to a third protocol, the functions provided by the third protocol being a superset of functions provided by the first and second IP telephony protocols, said interworking agent further adapted to determine that a first parameter associated with the first IP telephony protocol does not map to the second IP telephony protocol and communicating first parameter to the second protocol agent **without alteration**.

'658 Patent at Claim 1 (emphasis added).

Metaswitch challenges the verdict, arguing that Genband did not introduce substantial evidence of infringement of the "without alteration" limitation of Claim 1. The relevant claim language requires "communicating first parameter to the second protocol agent **without alteration**." (*Id.*) (emphasis added). Genband submitted that the accused Call Feature Server (CFS) and Integrated Softswitch products satisfy this claim element because the products' interworking agent, the ICC agent, passes an unmapped SIP parameter unchanged to the NCS protocol stack. (JMOL Resp. at 2.)

First, Metaswitch argues that Dr. Beckmann (Genband's technical expert) did not analyze source code evidence in support of this claim limitation. However, as this Court has held previously in this case, analysis of source code is not necessarily required to assess infringement. (Dkt. No. 413 at 6) ("There is no per se rule that an expert must analyze source code to opine about patent infringement . . . The Court has not been alerted to any deficiencies in the 'facts or data' upon which Dr. Beckmann bases his infringement contentions, so the Court will not strike

those opinions."). Genband argues that Dr. Beckmann did indeed rely upon MS-SRC-000269, which is CFS source code showing that the CFS may pass through certain parameters unaltered from the ICC to the outgoing signaling stacks. (JMOL Resp. at 3.)

Second, Metaswitch argues that Dr. Beckmann relied solely on his misinterpretation of deposition testimony from a single Metaswitch engineer, Jon Rowland, to support his analysis of this claim limitation. Mr. Rowland, the Metaswitch engineer, testified that:

> QUESTION: What happens to the part of the message structure that are SIP-specific and not common with NCS?
>
> ANSWER: So there are two parts to the answer to this.
>
> The first part, I mentioned earlier that as part of determining how to route the call, the ICC component can actually alter the set of information that is associated with the SGM message. It may be that some of the information that is SIP-specific is only relevant to that call routing and therefore has -- will have been discarded by ICC.
>
> It's like I've seen this parameter that's only needed so I know how to route the call. I can then discard that because I've used it for what it was needed for.
>
> So it may have been removed by ICC. **If it hasn't been removed by ICC and is still present in the SGM message structure and memory that the NCS signaling stack ultimately looks at, then it will just be discarded because the NCS protocol has no way to encode that information.**

(1/13/2016 P.M. Trial Tr. (Roland), Dkt. No. 472 at 56:12–57:5) (emphasis added). Metaswitch argues that Mr. Rowland's testimony establishes that any parameters that do not map are discarded, *not* communicated "without alteration" as required by the claim.

In contrast, Dr. Beckmann, Genband's expert, testified that Mr. Rowland's testimony indicates that:

> The first thing is that the ICC agent could look at it, and for whatever -- whatever reasons -- perhaps it's processed other information that would mean that it's redundant -- it could discard that.
>
> The second thing that could happen is the ICC agent could simply pass it **unchanged** to the NCS protocol stack.
>
> So one thing that indicates is that the ICC agent is making a determination. It's deciding what to do with it.

> The second thing is that there are parts of the information that are not common to both the SIP and the NCS signaling stacks that are passed **unchanged** to the NCS signaling stack, even though it may not be able to use it.

(1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 149:2–13) (emphasis added). The jury was free to consider both the testimony of Dr. Beckmann and Mr. Rowland in evaluating Genband's infringement analysis of this claim.

Furthermore, Dr. Beckmann relied upon a Metaswitch manual that described the functionality of the CFS interworking software, including that certain parameters may be discarded, while others may be passed on. (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 148:15–18) (relying on PX0064 at 559–61.) Genband now objects for the first time that the manual was irrelevant because it was merely draft documentation from 1999, five years before the '658 Accused Products were released in 2004, describing features that were never implemented in the accused products. Genband's objection as to relevance with regard to the manual is untimely and is therefore denied.

The Court finds that Genband presented sufficient evidence of infringement of the "without alteration" limitation of Claim 1 to support the jury's verdict. The Court is persuaded that Dr. Beckmann analyzed source code properly—to the extent it was necessary—in support of his infringement testimony, properly presented his expert opinion based on testimony of a Metaswitch engineer, and relied on a properly-admitted technical manual, and accordingly Genband has introduced sufficient evidence to support the jury's conclusion that the Accused Products practice "communicating first parameter to the second protocol agent *without alteration*."

*The "media capabilities description" limitation of Claim 11*

Next, Genband alleged that Metaswitch performed each of the limitations of independent

Claim 11 of the '658 Patent, which reads as follows:

> 11. A method for interworking devices that communicate using different internet protocol (IP) telephony protocols, the method comprising:
>
> (a) receiving, from a first telephony device, a first message formatted according to a first IP telephony protocol;
>
> (b) in response to receiving the first message, generating a second message, formatted according to a second protocol, said second protocol being distinct from said first protocol, the second message including at least one of a **media capabilities description** and media stream management information derived from the first message;
>
> (c) transmitting the second message to a second protocol agent; and
>
> (d) in response to receiving the second message, generating a third message formatted according to a third IP telephony protocol, the third message including at least one of the **media capabilities description** and media stream management information derived from the second message.

'658 Patent at Claim 11 (emphasis added). The disputed limitation requires a "media capabilities

description." *Id.* During trial, Genband's expert testified that the accused products satisfy this

claim limitation based on a Metaswitch technical document describing the internal operation of

the ICC and signaling stack components:

> **Q** In your opinion, does the CFS and the Integrated Softswitch practice Element (b) when it's used?
>
> **A** Yes, that's my opinion.
>
> **Q** The claim continues, the second message, including a said -- at least one of media capabilities description and media stream management information derived from the first message.
>
> What was your opinion with respect to this language and the CFS and the Integrated Softswitches?
>
> **A** Well, I indicate here what type -- what -- what media capabilities refer to. So they refer to the type of media -- and remember, that's the type of content – content stream.
>
> Is it high quality? Is it medium quality? Is it low quality? What is the -- what is the bit rate? How fast? How many bits per second are being transferred?

> So it's capabilities like that that are being referred to here in the media capabilities description.
>
> **Q** And you cited PX-65 at Page 80 for that?
>
> **A** That's correct.
>
> **Q** And are those media capabilities that you described, are those capabilities that are supported by the CFS, the Call Feature Server, and the Integrated Softswitches?

(1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 151:20–153:18) (discussing PX0065.0080). However, Metaswitch argues that this "media capabilities description" limitation is necessarily software functionality, and therefore Genband's discussion of the technical document was insufficient—Genband should have shown that Metaswitch's products contain software that performs this limitation, but it did not.

Genband counters that the Metaswitch manual that Dr. Beckmann cited does describe the software of the infringing products, and there is no per se rule that an expert must analyze source code to opine about patent infringement.

The Court is persuaded that Dr. Beckmann's discussion of the Metaswitch product manual provides sufficient evidence to support the jury's verdict that that Metaswitch performs the "media capabilities description" element of Claim 11.

iii. *Performance of each and every step of Claim 11*

Claim 11 of the '658 Patent, reproduced above, is a method claim. In order to infringe a method claim, substantial evidence of actual performance of each and every step is required. *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993). Showing that a product is merely capable of infringing a method claim is not enough. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010).

Metaswitch argues that Genband did not present any evidence that Metaswitch or its customers have actually performed all steps of Claim 11, and therefore there is no legally sufficient evidentiary basis to support the jury's verdict of infringement. (JMOL at 5.)

During trial, Dr. Beckmann explained that this claim is directly infringed because Metaswitch practices the method "when they are doing installation and commissioning." (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 158:17–20.) Specifically, Dr. Beckmann testified that installation and commissioning of the CFS and Integrated Softswitch products would necessitate use of the software, which constitutes direct infringement:

> Q If a person does commissioning or testing on a customer's device, how does that relate to your opinions of infringement in this case?
>
> A When -- when the installation -- if an engineer is doing the installation and doing the commissioning of the testing, then that would -- that would -- that would necessitate the use of the software that was loaded on to the computer readable medium.
>
> Q Would that be true with respect to the Call Feature Server and the Integrated Softswitches?
>
> A That's correct.

(*Id.* at 105:4–14.) Additionally, Metaswitch engineer Darrin Thomas explained that Metaswitch performs commissioning on "[e]very system that's sent out," including the accused products.

Unlike the patentee in *Mirror Worlds*, where the patentee "did not present any evidence of testing" and simply argued that "it was reasonable for the jury to infer that Apple necessarily tested the accused products and performed the patented steps," Genband introduced evidence that all elements of the method are performed during commissioning, which is done for every CFS and Integrated Softswitch that Metaswitch sells. *See Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 712–13 (E.D. Tex. 2011), *aff'd* 692 F.3d 1351, 1361 (Fed. Cir. 2012). Having reviewed the evidence and the parties' arguments, the Court is not persuaded that Genband failed to present substantial evidence that method Claim 11 was practiced and infringed. Accordingly,

the jury's verdict is properly supported. Metaswitch's Motion for Judgment as a Matter of Law with regard to infringement of the '658 Patent is **DENIED**.

### 2) Infringement of the '561 Patent

Next, Metaswitch argues that the Court should enter judgment of non-infringement as a matter of law because no jury could have found that Metaswitch infringed the asserted claims of the '561 Patent. (JMOL at 6.) Metaswitch argues that Genband offered no evidence of a "control channel" and failed to introduce substantial evidence that all IP packets are applied to the proxy or the packet filter. (*Id.* at 6–11.)

#### i. *Control Channel*

Metaswitch first argues that the evidence establishes that the '561 Accused Products do not include the claimed "control channel," as required by asserted claims 6, 17, and 20. (PX-5, '561 Patent.) The independent claims require that the claimed firewall must "apply[] the Internet protocol packets associated with the signaling channel and the control channel to the application proxy." (*Id.* at Claims 1, 17.) Metaswitch argues that Genband's expert, Dr. Beckmann, acknowledged that the claims identify a control channel separate from a signaling channel and that applying the control channel to the application proxy is a requirement of the claim. (JMOL at 6–7) (citing 1/13/2016 A.M. Trial Tr. (Beckmann), Dkt. No. 471 at 6:19–22, 27:13–21.) Metaswitch points to testimony by Metaswitch's expert, Dr. Williams, that the '561 Accused Products have a signaling channel and a bearer channel, but do not include the required "control channel." (JMOL at 7) (citing 1/14/2016 A.M. Trial Tr. (Williams), Dkt. No. 543 at 93:3–5.)

Metaswitch argues that Genband's expert, Dr. Beckmann, faced with no evidence of infringement, tried to advance a new infringement theory on cross-examination that the '561 Accused products might infringe because the claimed "control channel" could be the same channel as the separately claimed "signaling channel." Metaswitch argues that Dr. Beckmann's

testimony was inconsistent with his expert report and previous testimony, where he said that the "signaling channel" and "control channel" are not the same channel. (JMOL at 7–8) (citing 1/13/2016 A.M. Trial Tr. at 24:5–16, 8:2–4, 22:13–22, 23:19–24:4, 28:2–18.) Further, Metaswitch argues that Dr. Beckmann was impeached on cross-examination confirming that he had not presented any infringement theory under which the '561 Accused Products have separate control and signaling channels, as required by the claims. (*Id.*) Metaswitch contends that Dr. Beckmann's testimony is inconsistent, contradictory, and impeached, and therefore does not meet the "substantial evidence" threshold required to survive a Rule 50 motion. (JMOL at 8) (citing *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1345–48 (Fed. Cir. 2008); *ParkerVision, Inc. v. Qualcomm Inc.*, 621 Fed. App'x 1009, 1013–14 (Fed. Cir. 2015)). Finally, Metaswitch argues that its own expert, Dr. Williams, presented unrebutted evidence that '561 Accused Products do not include the required control channel that must be applied to the application proxy, and even explained why the asserted claims require three channels, while the '561 Accused Products only use two. Accordingly, Metaswitch argues, there was no evidence presented at trial of a control channel in the '561 Accused Products, and therefore the jury verdict of infringement cannot stand.

In response, Genband argues that the jury had a sufficient basis to reasonably conclude that the infringing products satisfy this claim limitation, and that Genband did indeed present evidence of a control channel. (JMOL Resp. at 6.) Specifically, Genband argues that Dr. Beckmann explained during direct examination that, although his testimony and demonstratives focus on the "signaling channel," the portion of the accused products that handles call signaling (referred to as DC-SIG) also handles call control and thus includes a control channel. (JMOL Resp. at 6) (citing 1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 36:6–25) (discussing

PX-522.11, which describes the call signaling plane as comprising separate layers that handle both signaling and control packets). Furthermore, Genband argues that there is no support for Metaswitch's argument that the control channel and signaling channel must be "separate and distinct," meaning that they cannot be communicated on the same physical wire. (JMOL Resp. at 7.) The parties agreed that the claim term "channel" should be construed as "stream of packets" but did not restrict each channel to be on a separate physical wire. (Dkt. No. 135 at 68.) Indeed, Dr. Beckmann testified that two channels can be "multiplexed into a single channel [sic, control] and signaling stream," in which case the terms *signaling* and *control* identify "which Internet Protocol packets" make up each of the two channels applied to the application proxy. (JMOL Resp. at 7) (citing 1/13/2016 A.M. Trial Tr. (Beckmann), Dkt. No. 471 at 24:7–21.) Genband further distinguishes Metaswitch's citations to *Johns Hopkins* and *ParkerVision* from this case, arguing that here Dr. Beckmann did provide an opinion and consistent supporting evidence for the claim element at issue (unlike *Johns Hopkins*), and Dr. Beckmann did not recant any of his previous testimony (unlike *ParkerVision*).

Metaswitch's position misreads the "channel" limitation of the patent and overly narrows the meaning of that term. As the parties agreed, the construction of "channel" is simply a "stream of packets," and the construction of channel is not limited to a single wire. Genband presented sufficient evidence at trial that the '561 Accused Products include a call signaling plane that contains separate layers that handle both signaling and control packets, and that these packets may be multiplexed and subsequently communicated on the same physical wire. (PX-522; 1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 36:6–25). The jury was free to evaluate the credibility of the testimony of both Dr. Beckmann and Dr. Williams, and the evidence

supports the jury's finding that the '561 Accused Products meet the "control channel" limitation of the independent claims.

        ii.     *Whether all IP packets are applied to the proxy or the packet filter*

Next, Metaswitch argues that Genband failed to introduce substantial evidence that ***all*** IP packets are applied to the proxy or the packet filter. Specifically, Metaswitch argues that the accused Perimeta product's rate limiting and congestion control capabilities require the Court to set aside the jury's finding of infringement because, as a result of those features, not *all* IP packets are applied to an application proxy or packet filter, as the claims require. (JMOL at 9–10.)

The Court construed the asserted claim limitations as follows:

| Claim Term | Court's Construction |
|---|---|
| **applying the Internet protocol packets associated with the bearer channel to [a / the] packet filter** ['561 Patent, Claims 6 [Claim 1], 17] | applying, for the setup, duration, and take down of the real-time Internet application, ***all*** IP packets associated with the bearer channel to the packet filter |
| **applying the Internet protocol packets associated with the signaling channel and control channel to [an / the] application proxy** ['561 Patent, Claims 6 [Claim 1], 17] | applying, for the setup, duration, and take down of the real-time Internet application, ***all*** IP packets associated with the signaling channel and control channel to the application proxy |

*See* (Dkt. No. 135 at 19–20; Dkt. No. 310 at 17) (emphasis added).

Specifically, the Court specified in both constructions that ***all*** IP packets associated with the channels must be applied to the proxy or packet filter. Metaswitch argues that, because the '561 Accused Products are designed to drop IP packets due to blacklisting, rate limiting, and congestion control before the packets reach the application proxy, and these packet-dropping features cannot be turned off, ultimately *not all* IP packets are applied to an application proxy or packet filter, as the asserted claims require. Metaswitch further argues that Genband's expert

admitted that it is impossible to know in advance of starting a call whether or not all packets will reach the application proxy because the features discussed above dynamically drop packets, and that he also was not able to point to any evidence that any particular call has a 100% chance of getting through because he never looked at any real-life packet streams. (JMOL at 10–11) (citing 1/13/2016 A.M. Trial Tr. (Beckmann), Dkt. No. 471 at 19–21). Therefore, Metaswitch concludes, no reasonable jury could have found infringement.

In response, Genband points out that Genband addressed the rate limiting and congestion control capabilities and presented expert testimony as well as Metaswitch 30(b)(6) witness testimony that the accused product, Perimeta, will apply all IP packets to the application proxy or packet filter for many VoIP calls. Specifically, relying on the testimony of Metaswitch engineer Nic Larkin, whose testimony deposition testimony was presented to the jury, Dr. Beckmann explained that "[i]n the normal case" (that is, when the Perimeta does not perform rate limiting or congestion control), Perimeta is designed to function to allow traffic to flow through and be applied per the Court's construction." (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 46:10–16.) Genband asserts that, consistent with controlling precedent, capability to apply all packets to the application proxy and packet filter for at least some calls is sufficient for infringement. *See, e.g.*, *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990).

Having considered the parties' arguments, the Court finds that Genband presented substantial evidence at trial that the accused products embody the claim limitations that all IP packets are applied to the application proxy or the packet filter, specifically in the normal use case of the Perimeta, where it does not perform rate limiting or congestion control. Just because the conditional features cannot be turned off does not necessarily mean that the conditions are

necessarily satisfied and therefore that packets are always being dropped. The evidence here supports a finding by the jury that the accused products meet this limitation. The jury was free to credit each side's testimony or not, and the Court finds justification to second guess the jury's findings or how they weighed and evaluated this particular evidence. As stated above, weighing competing evidence and selecting that evidence which they find most credible is the very essence of the jury's function within our legal system. This Court will not supplant that function. Metaswitch's Motion for Judgment as a Matter of Law with regard to infringement of the '561 Patent is **DENIED**.

### 3)  Infringement of the '427 and '984 Patents

Next, Metaswitch argues that the Court should enter judgment of non-infringement as a matter of law because no jury could have found that Metaswitch infringed the asserted claims of the '427 and '984 Patents, specifically with regard to the structure and function of the "packetization modules 110" limitations of each asserted claim. (JMOL at 11.)

Asserted claim 1 from each of the '427 and '984 Patents each have a "packetization modules operable to . . ." means-plus-function limitation:

> 1. A gateway for communicating telecommunication information, comprising:
>
> one or more **packetization modules operable to** receive first data packets from a first broadband network using a first data communications protocol and to extract first telecommunication information associated with a first subscriber from the first data packets, the **packetization modules further operable to** receive second data packets from a second broadband network using a second data communication protocol and to extract second telecommunication information associated with a second subscriber from the second data packets, wherein the first and second broadband networks include any of digital subscriber line, cable, and wireless platforms, wherein the first and second data communication protocols includes any of Internet Protocol, Asynchronous Transfer Mode, and Frame Relay protocols . . . .

('427 Patent at Claim 1.)

> 1. A gateway for communicating telecommunication information, comprising:

one or more **packetization modules operable to** receive first data packets from a first broadband network using a first data communications protocol and to extract first telecommunication information associated with a first subscriber from the first data packets, the **packetization modules further operable to** receive second data packets from a second broadband network using a second data communication protocol and to extract second telecommunication information associated with a second subscriber from the second data packets, wherein the first and second broadband networks include any of digital subscriber line, cable, and wireless platforms . . . .

('984 Patent at Claim 1.)

The Court construed the *function* of this limitation as: "receiving first/second data packets from a first/second broadband network using a first/second data communications protocol and extracting first/second telecommunication information associated with a first/second subscriber from the first/second data packets." (Dkt. No. 310 at 27.) The Court found the corresponding *structure* to be: "packetization modules 110 implemented on a separate printed circuit board; and equivalents thereof." (*Id.*)

Here, Metaswitch argues that Genband failed to present evidence of both the structure and the function of the "packetization modules" limitations as defined by the Court.

> i. *Whether accused products contain a structure identical or equivalent to "Packetization Modules 110"*

With regard to the structural disclosure of the "packetization modules 110," construed by the Court to be "packetization modules 110 implemented on a separate printed circuit board; and equivalents thereof," Metaswitch argues that the sole structural disclosure is in Figure 6.



In response, Genband argues that Metaswitch is improperly attempting to limit the corresponding structure to Figure 6, and that instead the Court's construction also encompasses Figure 5.



FIG. 5

In its supplemental claim construction, the Court rejected Metaswitch's argument that there is no corresponding structure, and pointed to the "corresponding structure" illustrated in Figure 5, not Figure 6. (Dkt. No. 310 at 24–25.) Then, during trial, Dr. Beckmann testified on Genband's behalf that the infringing products have the corresponding structure for "packetization module" identified in the Court's construction. (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 169:24 – 170:14.) Later in the trial, Metaswitch cross-examined Dr. Beckmann on Figure 6, during which he agreed that the structure shown in Figure 6 would need to be identified in the accused products in order to find infringement. (1/13/2016 A.M. Trial Tr., Dkt. No. 471 at 98:24–99:11) (referencing DDX-4-51, which depicts Fig. 6.)

A close read of the Court's construction, however, reveals that the Court referenced Figure 5 while rejecting Metaswitch's argument that there is no corresponding structure for the term. (Dkt. No. 310 at 24–25.) Accordingly, Genband's burden was to show evidence that the accused products have the corresponding structure as described in Figure 5. Having considered the Parties' briefing and argument on the matter, the Court finds that Genband met its burden and that the jury had substantial evidence in support of its verdict.

ii. *Whether accused products are capable of practicing the functional limitations of "Packetization Modules 110"*

Second, Metaswitch argues that Genband failed to introduce sufficient evidence regarding the functional limitations of "packetization modules 110," which the Court construed to mean:

> receiving first/second data packets from a first/second broadband network using a first/second data communications protocol and extracting first/second telecommunication information associated with a first/second subscriber from the first/second data packets."

(Dkt. No. 310 at 27.)

a. "[first / second] broadband network"

Pursuant to the claim limitation, a proper infringement read must include both a first and a second broadband network. Genband presented evidence at trial to demonstrate that the infringing products can receive packets from at least two broadband networks, for instance with DSL and cable networks. (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 168:9–15, 174:4–17, 176:19–177:6, 177:18–178:15, 179:22–180:6; *see also* PX-304.010, PX-305.020.) In response, Metaswitch argues that Genband's expert testified that the accused products can only receive data packets from an Ethernet switch, which is not a broadband network. Countering, Genband argues that Metaswitch's attempt to argue that the packetization module need not receive the packets *directly* from the broadband network is overly narrow and inconsistent with the Patent. Since not being able to receive the packets using an intermediary component (*i.e.*, the Ethernet port of the accused devices) would exclude preferred embodiments, such as Figure 5, the Court rejects Metaswitch's narrow interpretation of this element of the function limitation.

b. "[first/second] data communication protocol"

Similarly, pursuant to the claim limitations, a proper infringement read must include at least two types of data communication protocols. Genband and Metaswitch disagree on whether or not multiple versions of Internet Protocols ("IP"), such as IPv4 and IPv6, qualify as two different *types* of data communication protocols. The claims identify several possible types of data communications protocols: IP, Asynchronous Transfer Mode ("ATM"), and Frame Relay. However, the accused products only support IP. Accordingly, Metaswitch argues, because Genband's expert was only able to point to IPv4 and IPv6 as the two data communication protocols, and because those two protocols are actually the same *type*—IP, Genband did not present substantial evidence that there is more than one data communication protocol in the accused product.

Genband argues that the different protocols Genband's expert relied upon are all versions of IP or ATM. Therefore, those protocols satisfy the limitation that "the first and second data communications protocols includes any of Internet Protocol, Asynchronous Transfer Mode, and Frame Relay protocols." Genband further argues that Metaswitch does not provide any reason why the first and second data protocols cannot be IPv4 and IPv6, which are two different types of IP with different fields and different addressing schemes. In fact, at trial, a Metaswitch witness conceded that IPv4 and IPv6 are different protocols.

Having considered the parties' argument on these matters, the Court finds that the claim limitations here require only that the data communication protocols be either IP, ATM, or Frame Relay protocols, but does not preclude the consideration of two types of IP protocols—such as IPv4 and IPv6—as different types of data communications protocols, satisfying the functional limitation of this claim element.

Accordingly, Metaswitch's Motion for Judgment as a Matter of Law with regard to infringement of the '427 and '984 Patents is **DENIED**.

### 4) Infringement of the '971 Patent

Next, Metaswitch argues that the Court should enter judgment of non-infringement as a matter of law because Genband failed to show infringement of the "SSF-IP" limitation by the '971 Accused Products and further did show infringement of every version of the Accused Products. (JMOL at 16.)

### i. *Infringement of "SSF-IP" Limitation by the Metaswitch CFS and Integrated Softswitches*

First, Metaswitch argues that Genband failed to show that Metawitch's CFS (Call Feature Server) and Integrated Softswitches infringe the "SSF-IP" limitation of Claims 70, 80, and 92 of the '971 Patent.

The Court construed the relevant terms as follows, including one construction by the Parties' agreement:

| Claim Term | Construction |
|---|---|
| **Internet Protocol (IP) Service Switching Function (SSF-IP)**<br>['971 Patent, Claims 70 and 92] | a Service Switching Function capable of directly communicating with a device on an IP network<br><br>(Parties' agreed construction) |
| **Service Switching Function (SSF)**<br>['971 Patent, Claims 70 and 92] | the set of processes that provide the communication path for interaction between a ***call control function*** and a service control function<br><br>(Court's construction) |

*See* (Dkt. No. 135 at 43–46, 69) (emphasis added). Importantly, the construction of the term "SSF-IP" derives from the term "SSF," which describes a call control function.

However, Metaswitch argues that Genband's expert did not present any evidence that the Accused Products include a "call control function" per the Court's construction of the term "SSF." (JMOL at 16.) To the extent Geband's expert presented testimony on the SSF limitation, Metaswitch argues it was conclusory and failed to apply the entire construction of the term "SSF." (*Id.*) In contrast, Metaswitch argues, Metaswitch presented direct evidence that the '971 Accused products do not include an SSF. (*Id.*) (citing 1/13/2016 P.M. Trial Tr. (Mitchell), Dkt. No. 472 at 181:23–182:13; 1/14/2016 P.M. Trial Tr. (Akl), Dkt. No. 474 at 11:16–12:10.). Accordingly, Metaswitch submits that no reasonable jury could have found that the CFS and Integrated Softswitches included the required SSF.

In response, Genband argues that it presented substantial evidence showing that the accused products satisfy the "SSF-IP" limitation of the '971 Patent. Specifically, Genband points out that Metaswitch's 30(b)(6) representative Duncan Archer testified that the CFS "performs a role of a service switching point" and can communicate with devices on an IP network. (JMOL Resp. at 13.) Dr. Beckmann explained that Mr. Archer's testimony established that the CFS is an IP-SSF:

> A: . . . [T]he question that [Mr. Archer] was asked at the top of the page was whether or not the role -- the role of the Call Feature Server in providing advanced intelligent networking services, what is that role?
> And Mr. Archer replied that it performs a role of a service switching point. He also added and signal transfer point, but for -- the important part of this claim is his testimony that it performs the role of a service switching point.
> And then he was asked: And the Call Feature Server can receive a request for a toll-free call from the calling party either on an IP network or a TDM telephone network?
> And he says: Yes, it can. So, in fact, that does establish, in Mr. Archer's opinion, that the Call Feature Server is an IP-SSF.

(1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 89:5–19).

Metaswitch contends that this evidence is insufficient because some of the testimony and evidence uses the term "SSF" rather than the Court's construction of SSF. However, Genband argues that the Court has already considered and rejected this argument twice—once in Metaswitch's motion to strike and again as an objection taken up at trial:

> It is entirely appropriate for Dr. Beckmann to determine, in his judgment as an expert, that a product described as an SSF is an SSF as construed by the Court. The absence of a lengthy analysis in his report of why this is so does not indicate that he has misapplied or disregarded the Court's construction. The Court will not strike Dr. Beckmann's opinion.

(Dkt. No. 413 at 9); (Dkt. No. 470 at 77:22–86:20).

The Court denies Metaswitch's motion for judgment as a matter of law on this basis for the same reasons set forth in its Order denying Metaswitch's motion to strike. (Dkt. No. 413 at 9.)

## ii. *Infringement by 42 of the 49 versions of accused products*

Next, Metaswitch argues that Genband only introduced evidence of infringement for seven out of forty-nine accused products, and therefore Genband is not entitled to damages for the remaining forty-two accused products because it failed to meet its burden of proof. Metaswitch contends that Genband's expert admitted that different versions of different products, even for the same feature, may implement those features in different ways, and also admitted that he did not separately analyze each version of the accused products to assess infringement of the '971 Patent. (JMOL at 18.)

In response, Genband argues that Metaswitch itself had taken the position that there was only one relevant difference among the product versions (Dkt. No. 472 at 7:16–9:15) (discussing Metaswitch's response to Interrogatory No. 13). Based on Metaswitch's position, Dr. Beckmann testified that any differences between versions of the accused products are irrelevant, and that he took the single difference identified by Metaswitch into account when determining infringement.

Specifically, with regard to the '971 Patent, Dr. Beckmann testified that it was his understanding that Mr. Archer's testimony, which Dr. Beckmann used to establish infringement, was not limited to any particular version but instead applied to all versions of the accused products.

> Q. What did you understand [Mr. Archer's deposition] testimony to apply to?
> A. His testimony, as I understood it, applied to all of the versions that -- that -- which he had dealt with.
> Q. Do you understand whether he was under oath just like you are here today?
> A. That was my understanding.
> Q. Did you rely on his -- his answers?
> A. I definitely relied on Mr. Archer's testimony.

(1/13/2016 Trial Tr. (Beckmann), Dkt. No. 472 at 15:9–16.)

Federal Circuit precedent allows presentation of expert testimony that analyzes infringement of a representative product on an element-by-element basis, followed by a summary opinion that *all* the other accused products infringe based on the same analysis. *TiVo Inc. v. EchoStar Commc'n Corp.*, 516 F.3d 1290, 1308 (Fed. Cir. 2008). It is true that the burden to prove infringement never shifts to the Defendant, but that is not what happened here. *See* (JMOL at 17) (citing *Medtronic, Inc. v. Mirowski Family Ventures*, 134 S. Ct. 843, 849 (2014)). Instead, Genband built its case for infringement upon a response by Metaswitch that all of its products operate in substantially the same manner insofar as it was relevant to infringement. Metaswitch's interrogatory response provided adequate basis for Genband's infringement analysis regarding the forty-two versions of products at issue here, and the Court finds that Genband did present substantial evidence that each and every version of the accused products infringe. Therefore, Metaswitch's Motion for Judgment as a Matter of Law with regard to infringement of the '971 Patent is **DENIED**.

### 5) Infringement of the '279 and '589 Patents

Finally, Metaswitch argues that the Court should enter judgment of non-infringement as a matter of law because no jury could have found that Metaswitch infringed the asserted claims of

the '279 and '589 Patents. (JMOL at 19.) Specifically, Metaswitch argues that Genband failed to present evidence of the "user interface" and "command" limitations of Claim 25 of the '279 Patent and Claim 15 of the '589 Patent.

> i. *Infringement of the "system for controlling a [voice device / user terminal] . . . comprising a user interface" limitation*

First, Metaswitch argues that Genband failed to present evidence that the accused product combinations, (1) Metaswitch's CommPortal plus MTAS products and (2) Accession plus MTAS products, infringe the "system for controlling a [voice device / user interface] . . . comprising a **user interface**" limitation of Claim 25 of the '279 Patent and Claim 15 of the '589 Patent. (JMOL at 19.) Metaswitch submits that the claims require that the user interface be part of the claimed "system for controlling," but that Genband's expert merely identified user interfaces on a user's device, such as an iPad or smartphone, and therefore failed to identify a user interface that is *part of* the Accused Products.

In response, Genband submits that Dr. Beckmann testified that the Accession and CommPortal software portions of each accused combination of products satisfied the "user interface" limitation of the asserted claims. (JMOL Resp. at 16.) Specifically, Genband cites Dr. Beckmann's infringement analysis testimony:

> Q. The next element is a user interface including one or more selectors for call control related to call sessions. What's your opinion as to whether or not Accession with Meta -- with MTAS meets that limitation?
>
> A. My opinion is that it is, and this is one of the screenshots from the video that we just finished seeing. This is where the gentleman was using the iPad running the Accession software. And there are different -- different things provided by the user interface, which is the -- the Accession communicator software that -- that offered a selection of what to do the transfer to.

(1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 118:22–119:14.) Genband argues that Metaswitch is, for the first time, proposing that the "user interface" must be hardware and cannot

be a software interface such as the accused Accession and CommPortal software. (JMOL Resp. at 17.) Genband submits that this narrow interpretation of "user interface" is improper and inconsistent with the plain meaning of "user interface," which could encompass software, hardware, or a combination of both hardware and software. (*Id.*)

Since this issue was not raised at claim construction, the Court did not expressly construe the term "user interface" or the phrase "system for controlling a [voice device / user interface] . . . comprising a **user interface**." The term and phrase are therefore required to be given their plain and ordinary meaning, as understood by one of ordinary skill in the art at the time of the invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Having reviewed the asserted patents and the testimony offered at trial, The Court is not persuaded that the phrase "system for controlling a [voice device / user interface] . . . comprising a **user interface**" requires that the user interface be only hardware, as Metaswitch argues. No such limiting language is found in the claims at issue.

Because the ordinary meaning of "user interface" is not limited to hardware, and because Genband's expert testified that the software components of the accused products are "user interface[s]," Genband has introduced sufficient evidence to support the jury's conclusion that the accused product combinations satisfy the "system for controlling a [voice device / user terminal] . . . comprising a user interface" limitations.

ii.    *Infringement of the "command[]" limitations*

The parties dispute the proper reading of the "command[]" limitations of claim 25 of the '279 Patent and claim 15 of the '589 Patent. The relevant claim language of claim 25 of the '279 Patent reads:

> an interface to transmit one or more **commands** relating to the call session to the voice device to establish a link between the voice device and the remote device over the data network.

('279 Patent, at Claim 25) (emphasis added). The relevant claim language of claim 15 of the '589 Patent reads:

> an interface to transmit one or more **commands** relating to the call session to the user terminal to establish a link between the user terminal and the remote device over the data network, wherein audio and video data are exchanged in the link.

('589 Patent, at Claim 15) (emphasis added).

Neither Party sought construction of the term "commands" specifically. The Court did state in its Claim Construction Order that "the specification discloses, for example, that the control system may transmit commands to the telephony device merely to notify it of status. *See* '279 Patent at 5:38-42." (Dkt. No. 135 at 36.) During trial, the Court resolved disputes over demonstratives relating to the "commands" claim limitation by ensuring the Parties adhered to presentation that would not contradict the explicit language of the Claim Construction Order. At no time did the Court provide any further construction of the term:

> . . . yesterday morning, before the jury was brought in, before 8:30 a.m., in chambers, an issue was raised about certain demonstratives, and they were centered around the word "command" from the claim language. And particularly, there was a discussion regarding Judge Payne's prior [Claim Construction] order, Document 135.

> The Court ruled on those disputed demonstratives based on the express language in the order set forth as Document 135. Particularly, I called to the attention of the parties the sentence on Page 36 which states: Further, the specification discloses, for example, that the control system may transmit commands to the telephony device merely to notify it of status.

> That particular sentence, together with what's set forth in Pages 35 through 37 of that prior order, was the basis of my directive to the parties. And the demonstratives offered were so -- or the -- the use or non-use of the demonstratives were covered by that clarification to the parties in chambers.

(1/15/2016 A.M. Trial Tr., Dkt. No. 475 at 30:3–31:20.)

Metaswitch argues that, for the "commands" claim element, Genband's infringement expert only pointed to "invites" in the accused products, which Metaswitch alleges are not "commands" in the context of the asserted claims. (JMOL at 20–21.) Metaswitch further argues that Genband's expert acknowledged that the Merriam Webster Dictionary provides that a "command" means "to direct authoritatively," and that definition should be used to interpret the claim limitation here (1/13/2016 A.M. Trial Tr. (Beckmann), Dkt. No. 471 at 69:11–21.)

Genband disputes Metaswitch's reading of the claim, arguing that "invites" and other informational messages are properly included in the meaning of "command." (JMOL Resp. at 17–18.) To satisfy this claim element, Genband introduced evidence that the accused products meet this claim limitation when the MTAS transmits appropriate messages to the endpoint devices to establish a call session. *See* (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 121:25–122:15) (discussing PX0540.0098).

Metaswitch now argues that Genband failed to cite any other evidence that shows that "commands" includes invites, and further argues that the claims themselves distinguish between "messages" (which includes invites) and "commands" by separately using both terms. ("JMOL Reply," Dkt. No. 562, at 8.)

The Court is not persuaded by Metaswitch's argument that "command" should be interpreted so narrowly as to exclude "invite" messages. Metaswitch had an opportunity to identify this claim term for construction during the pre-trial claim construction process, but did not. Accordingly, Metaswitch's untimely argument that this Court should separately and narrowly construe the claim term is unpersuasive. Nor is the evidence that Metaswitch cites here persuasive. Indeed, though Dr. Beckmann did agree that the Merriam-Webster Dictionary defined the term "command" in a certain way, the jury was free to rely on Dr. Beckmann's

testimony regarding the applicability of the claim term to the accused products in light of the fact that the Court did not construe this particular term. Since the ordinary meaning of "commands" does not exclude invitations, and because Genband identified invite messages as commands, Genband has introduced sufficient evidence to support the jury's conclusion that the accused products "transmit one or more **commands** relating to the call session." Accordingly, Metaswitch's Motion for Judgment as a Matter of Law with regard to infringement of the '279 and '589 Patents is **DENIED**.

### 6) Induced infringement

Next, Metaswitch argues that Genband failed to produce sufficient evidence of specific intent to support the jury's finding of induced infringement (JMOL at 21.)

Metaswitch's first argument on this point is that there is no evidence that Metaswitch specifically intended to encourage any third party to infringe Genband's patents, or believed that its customers' use of its products was infringing. (JMOL at 21.) However, as the Court already recognized in rejecting Metaswitch's summary judgment motion, "[t]he mere fact that Metaswitch has raised and maintained non-infringement defenses in this litigation does not suffice to entitle it to summary judgment [on indirect infringement]." (Dkt. No. 408 at 8.) During trial, Genband's expert, Dr. Beckmann, presented evidence indicating that Metaswitch advertises to the customer how to use the product, how the product works, and the types of steps that can be taken to use the product. (1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 57:23–58:7.) It is undisputed that Metaswitch knew of the '279 Patent at least as early as January 2008 and of the remaining asserted patents after the filing of the lawsuit. (JMOL Resp. at 19.) A mere good-faith belief in the non-infringement of asserted patents does not by itself justify judgment as a matter of law of no induced infringement. Further, the jury had ample opportunity to consider Genband's evidence of infringement and the specific intent required for a finding of induced

infringement, in line with the Federal Circuit's precedent regarding the same. *See Ericsson v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014) ("Making findings of fact by weighing evidence—such as the evidence presented by the parties regarding induced infringement—is the role of the jury").

Metaswitch's second argument is that it is cannot be liable for any claims of indirect infringement because Genband failed to establish a specific act of direct infringement by any particular Metaswitch customer. (JMOL at 22.) At trial, Genband submitted circumstantial evidence of direct infringement, which Genband contends is sufficient to prove direct infringement. (JMOL Resp. at 18) (citing *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012)). Specifically, Dr. Beckmann testified regarding direct infringement by Metaswitch's customers. For instance, with regard to the '561 Patent, he testified:

> Q. Does Metaswitch indirectly infringe Claims 6, 17, and 20?
> A. Yes, it does. And in the sense that once the customer has bought the equipment and is using the equipment – the Perimeta equipment from Metaswitch, then the customer is directly infringing.
>     And Metaswitch induces that infringement in terms of, for example, advertising to the customer how to use the product, how the product works, and the types of steps that can be taken.
> Q. Is Metaswitch's providing of software to a customer to put on its CRM relevant to inducement of infringement?
> A. Yes.
> Q. How is it relevant?
> A. That -- the -- the providing of that software is what it is required in order for the customer to become a direct -- direct infringer. If Metaswitch doesn't do that, then the customer cannot directly infringe without having the product available.

(1/12/2016 P.M. Trial Tr. (Beckmann), Dkt. No. 470 at 57:23–58:16). Dr. Beckmann submitted similar testimony regarding the other patents-in-suit. *See* (*id.* at 109:8–17 ('971 Patent); 129:25–130:14 ('279 and '589 Patents); 158:7–16 ('658 Patent); 188:1–7 ('427 and '984 Patents)). Genband is not required to identify any particular customer as a direct infringer. *See Toshiba*, 681 F.3d at 1364.

The Court sees no reason, given the evidence, to question the jury's factual findings, and Metaswitch's arguments on induced infringement seeking judgement as a matter of law are **DENIED**.

**B.** **Judgment as a Matter of Law as to Invalidity of the '561, '971, '279, and '589 Patents**

Metaswitch requests that the Court overturn the jury's verdict and enter judgment that four of the patents-in-suit are invalid as a matter of law. (JMOL at 22–30.)

**1)** **Invalidity of the '561 Patent under §§ 102 and 103 in view of the Kuthan and Mercer references**

Metaswitch argues that it presented unrebutted clear and convincing evidence that asserted claims 6, 17, and 20 of the '561 Patent are invalid as obvious and anticipated in view of the "Kuthan" reference (DX-450, Dkt. No. 537-52) in combination with other prior art and is therefore entitled to judgment as a matter of law as to invalidity. (JMOL at 22–23.)

In particular, Metaswitch argues that Mr. Kuthan (a third party prior art witness) and Dr. Williams (Metaswitch's invalidity expert) presented unrebutted testimony that all elements of the asserted claims were disclosed in Kuthan's Firewall Control Protocol publication, which was publicly available in June 2000, before the priority date of the '561 Patent. (*Id.*) (citing 1/14/2016 A.M. Trial Tr. (Corrected), Dkt. No. 543 at 70–72, 75–79, 113–15.) Metaswitch argues that Figure 1 of Kuthan by itself discloses the features recited in independent claim 17. Metaswitch further argues that with regard to dependent claim 20, Kuthan (DX-450 at Section 3.7.4) discloses the NAT process claim element. With regard to dependent claim 6, Metaswitch argues that Dr. Williams testified that the Kuthan reference discloses the claim element requiring operation of the firewall for the duration of the session. Genband's validity expert, Mr. Lanning, testified that the Kuthan reference is different than the asserted claims of the '561 Patent because it handles the packets differently than what's required by the claims of the patent; specifically,

that "everything goes through the packet filter before it goes to the proxies, meaning they don't split initially." (JMOL at 23) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 183–85). Nevertheless, Metaswitch argues that Mr. Lanning's validity opinion fails because the asserted claims are open-ended "comprising" claims that can include additional, unclaimed steps. (*Id.*) (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003)). Accordingly, Metaswitch contends that Kuthan anticipates claims 6, 17, and 20 of the '561 Patent.

Metaswitch further argues that the claims are obvious in light of Kuthan (DX-450) and "Mercer" (DX-451). To the extent that elements of claim 17 requiring (ii) applying the packets associated with the signaling channel and the control channel to the application proxy, and (iii) applying the packets associated with the bearer channel to the packet filter are missing in Kuthan, Metaswitch argues that Dr. Williams offered unrebutted testimony that the channel characteristics described in Mercer would have motivated a person of ordinary skill in the art to combine Mercer with Kuthan to arrive at the invention claimed in the '561 Patent. (JMOL at 24) (citing 1/14/2016 A.M. Trial Tr. (Corrected) (Williams), Dkt. No. 543 at 122–23).

Genband responds by arguing that the jury properly relied on undisputed testimony by Mr. Lanning (Genband's validity expert) that Kuthan applies all packets to a packet filter first, and then some signaling packets are communicated from the packet filter to an application layer gateway, unlike the '561 Patent claims, which require applying the signaling packets to the application proxy and applying the bearer packets to the packet filter. (Dkt. No. 558, "JMOL Resp.," at 21). As discussed above, Metaswitch objects to Mr. Lanning's interpretation of the claims, but Genband points out that the Court has already rejected Metaswitch's position. (*Id.* at 22) (citing Dkt. No. 425 at 8). Indeed, in denying Metaswitch's motion to strike Mr. Lanning's

expert report, the Court noted that Mr. Lanning's interpretation of the claims does not contradict the use of the word "comprising," and "[w]hether he has correctly applied the properly construed claim to the prior art is a question of fact." (Dkt. No. 425 at 8.) Genband also argues that Mercer, like Kuthan, teaches that all packets are applied to the packet filter first and then some of those packets are routed from the packet filter to the application proxy. Accordingly, Genband contends, Mercer does not read on the asserted claims for the same reasons that apply to Kuthan. Therefore, Genband argues, Metaswitch has not met its burden to show that no reasonable jury would have a legally sufficient evidentiary basis to find for Genband.

The jury was free to weigh the competing testimony and weigh the credibility of the witnesses. Ultimately, the jury agreed with Genband's expert. After consideration of the admitted evidence, including evidence regarding whether Kuthan and Mercer disclosed the limitations for which they were being relied upon, the jury found that the asserted claims were valid. *See* (1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 184–85, 187–88.) The Court will not substitute its judgment for that of the jury. Applying the clear and convincing standard, the jury found that the asserted claims were not invalid. The Court does not find that no reasonable jury could have found the asserted patents were valid based on the presented evidence. Accordingly, Metaswitch's Motion for Judgment as a Matter of Law in regard to invalidity of the '561 Patent is **DENIED**.

### 2) Invalidity of the '971 Patent under § 102 in light of Cisco's Open Packet Telephony ("Cisco OPT")

Metaswitch argues that it presented unrebutted clear and convincing evidence that asserted claims 70, 80, and 92 of the '971 Patent are invalid as anticipated in view of Cisco OPT, and to the extent that they are not, it would have been obvious to use internet based protocols in a telecommunications system (JMOL at 24–27) (citing DX-124, 125, 130, 131, 140).

As a preliminary matter, Genband filed objections to Metaswitch's reliance in its JMOL on exhibits that were never presented to the jury, arguing that Metaswitch cannot rely on exhibits not in the record to support a Rule 50 motion for judgment as a matter of law. (Dkt. No. 557; JMOL Resp. at 23 n.18, 27 n.22) (citing *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353 (Fed. Cir. 2011). Metaswitch withdrew the exhibits. (Dkt. No. 562 at 9 n.5.) Accordingly, the Court excludes and does not rely on the exhibits that were not presented to the jury, including, with regard to the '971 Patent, DX-123, 128, 133, 134, 137, 138, 139, 142, and 143. However, the Court has properly considered the exhibits presented during trial to the jury: DX-124, 125, 130, 131, and 140.

Turning to the claim language of the '971 Patent, independent claims 70 and 92 require a SSF-IP—which the Court construed as "a Service Switching Function capable of directly communicating with a device on an IP network" (Dkt. No. 135 at 69)—that receives a message on an IP network requesting a communications service and then produces a query relating to implementation of the communications service for receipt by a Service Control Function in response to the message. Claim 80 adds that the communication service is a toll-free call.

In support of its argument that the '971 Patent claims are invalid as a matter of law, Metaswitch argues that its expert, Dr. Burger, testified that all elements of the asserted claims were disclosed in Cisco's OPT system, details of which were publicly disclosed before March 10, 1999, and which discloses an SSF or SSP that could directly communicate with devices on an IP network. (JMOL at 24–25) (citing 1/14/2016 P.M. Trial Tr. (Burger), Dkt. No. 474 at 69–74).

### i. *Cisco OPT as prior art*

Invalidating prior art need not be an actual product; prior knowledge by others may invalidate a patent under Section 102(a) if the prior knowledge was accessible to the public. *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir. 2005); *see also W.L. Gore*

*& Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549–50 (Fed. Cir. 1983).

Here, Genband argues that its expert, Mr. Lanning, testified that Cisco OPT does not qualify as prior art, explaining that one of ordinary skill in the art would view the high-level PowerPoint presentations as to the OPT system as mere product plans and with clear statements therein characterizing such presentations as simply product plans. (JMOL Resp. at 23) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 178–80). In response, Metaswitch argues that Dr. Burger testified that he first became aware of the OPT system in the 1998–1999 time frame when he personally received "this presentation" from Mr. Alastair Woodman. (1/14/2016 P.M. Trial Tr. (Burger), Dkt. No. 474 at 76). However, Dr. Burger did not testify which presentation he was referring to, nor whether that presentation was presented before the '971 Patent's filing date (Dec. 1, 1999) or its priority date (Mar. 10, 1999). Metaswitch did not introduce any other evidence indicating that the Cisco OPT system or the Virtual Switch Controller were ever for sale. Accordingly, Metaswitch failed to present evidence that compels a finding that the Cisco OPT system qualified as prior art. The jury had sufficient evidence from which to properly find that the Cisco OPT system did not qualify as prior art.

ii. *Cisco OPT does not anticipate or render the '971 Patent obvious*

Metaswitch argues (based on the assumption that the Cisco OPT system qualifies as prior art) that its expert testified that all elements of the asserted claims are disclosed in Cisco's OPT. (JMOL at 24.) Specifically, Metaswitch argues that the Cisco OPT system discloses an SSF-IP called the Virtual Switch Controller. (JMOL at 25–26.) In response, Genband argues that its expert, Mr. Lanning, explained that the Cisco OPT system did not use the claimed SSF-IP, but rather conventional SSF/SSP nodes that are not connected to the IP network, but rather use an intermediary to communicate with the IP network. (JMOL Resp. at 24) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 180–81). Mr. Lanning explained to the jury that the missing

SSF-IP is why the Cisco OPT system did not anticipate or render obvious the '971 Patent. (JMOL Resp. at 25) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 181). Accordingly, the discrepancy between the parties' positions amounts to a straightforward factual dispute that was properly submitted to the jury and the jury's verdict in Genband's favor is supported by substantial evidence.

> iii. *The technology of the '971 Patent is not obvious as a matter of law*

Finally, Metaswitch argues in its opening brief that, even if the '971 Patent is not anticipated by Cisco OPT, the asserted claims of the '971 Patent are obvious as a matter of law because, with the exception of the IP functionality in these claims, Genband's expert acknowledged that the other limitations—including non-IP SSFs—existed in the prior art. (JMOL at 26) (citing 1/12/2016 P.M. Trial Tr., (Beckmann), Dkt. No. 470 at 65–68). Metaswitch submits that testimony, in conjunction with Federal Circuit case law invalidating patents for obviousness when well-known Internet technology was used in existing business processes, in support of its argument that it would have been obvious to use internet-based protocols in a telecommunications system. (JMOL at 26).

Genband disagrees, arguing that Metaswitch makes both factual and legal errors in its argument. First, Genband argues that Genband's expert correctly explained that the '971 Patent involved more than just adding IP capability to known technology; it actually brought intelligent networking services to those on IP-based networks. (JMOL Resp. at 26 ) (citing 1/12/2016 P.M. Trial Tr., (Beckmann), Dkt. No. 470 at 62–65). Accordingly, Genband argues, the jury had sufficient evidence to disagree with Metaswitch's factual characterization of the '971 Patent. Second, Genband argues that Metaswitch's reading of Federal Circuit case law is incorrect—that it has not held broadly that simply adding Internet capability to existing technology—and inapplicable—that the '971 Patent does more than add Internet capability, and instead involves a

new device, the SSF-IP that was not found in the prior art and that was used to provide IP

network users with access to complex telephony features on existing telephone networks.

iv.  *The '971 Patent claims are not invalid*

The jury was free to weigh the competing testimony and weigh the credibility of the

witnesses. Ultimately, the jury agreed with Genband's expert. After consideration of the

admitted evidence, including evidence regarding whether Cisco OPT disclosed the limitations for

which it was being relied upon, the jury found that the asserted claims were valid. The Court sees

no basis to obviate the jury's considered judgment. Applying the clear and convincing standard,

the jury found that the asserted claims were not invalid. The Court does not find that no

reasonable jury could have found the asserted patents were valid based on the presented

evidence. Accordingly, Metaswitch's Motion for Judgment as a Matter of Law in regard to

invalidity of the '561 Patent is **DENIED**.

### 3)  Invalidity of the '279/'589 Patents under § 102 in light of Lucent's MMCX System (MMCX) and Bayer

Metaswitch argues that it presented unrebutted clear and convincing evidence that

asserted claim 25 of the '279 Patent and claim 15 of the '589 Patent are invalid as anticipated in

light of Lucent's MMCX System ("MMCX") (DX-21, 22, 25, 30, 31, 33) and *CTI Solutions and*

*Systems: How to Put Computer Telephony Integration to Work* ("Bayer") (DX-499). The

asserted claims generally relate to making telephone calls with a user interface between two

telephone devices. Claim 15 of the '589 Patent adds audio and video data to the call described in

Claim 25 of the '279 Patent.

As a preliminary matter, Genband filed objections to Metaswitch's reliance on exhibits

that were never presented to the jury, arguing that Metaswitch cannot rely on exhibits not in the

record to support a Rule 50 motion for judgment as a matter of law. (Dkt. No. 557; JMOL Resp.

at 23 n.18, 27 n.22) (citing *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1353 (Fed. Cir. 2011). Metaswitch withdrew the exhibits. (Dkt. No. 562 at 9 n.5.) Accordingly, the Court excludes and does not rely on the exhibits that were not presented to the jury, including, with regard to the '279/'589 Patents, DX-19, 20, 23, 24, 26–29, 32, and 34–39. However, the Court has properly considered exhibits presented during trial to the jury: DX-21, 22, 25, 30, 31, and 33. The Court takes up each reference in turn.

i. *The MMCX system does not anticipate the '279 and '589 Patents*

Metaswitch argues that its expert's unrefuted testimony established that MMCX was known, sold, offered for sale, or in public use before October 10, 1999 and that MMCX discloses each limitation of the asserted claims. (JMOL at 28.) Metaswitch argues that MMCX discloses the claim element of a user interface with selectors for call control that enable video conference calls. (*Id.*) (citing DX-31.005). However, for the remaining limitations, Metaswitch does not cite any evidence that demonstrates that the trial evidence meets the heightened requirement of clear and convincing evidence with an "overwhelming effect" such that no reasonable juror could disagree. *See Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1322–23 (Fed. Cir. 2016); *Grey v. First Nat'l Bank in Dallas*, 393 F.2d 371, 380 (5th Cir. 1968).

In response, Genband argues that the claims require a particular arrangement of messages and commands, and that the communication paths illustrated in the MMCX references do not satisfy the required arrangement (JMOL Resp. at 27) (citing *Am. Calcar, Inc. v. Am. Honda Motor Corp.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011)). As an example, Genband points to specific aspects of Claim 25 of the '279 Patent:

> 25. A system for controlling a voice device connected to a data network, comprising:
>
> a user interface including one or more selectors for call control relating to call sessions;

**a controller adapted** to receive a request from the user interface and **to generate one or more messages for communication over the data network to establish a call session with a remote device**; and

**an interface to transmit one or more commands relating to the call session to the voice device to establish a link between the voice device and the remote device over the data network**.

('279 Patent, Claim 25) (emphasis added). Genband argues that Metaswitch failed to identify any message flow diagrams or other disclosures showing the claimed arrangement of messages in the MMCX references. Genband further submits that its expert, Mr. Lanning, testified that the claimed arrangement was not disclosed by the MMCX system (JMOL Resp. at 28) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 202–16). Indeed, Mr. Lanning explained that Metaswitch's evidence only disclosed how components of the MMCX system were connected, not what kind of messages were sent and by whom:

> Q. And here we have Defendants' Exhibit 30.14. Can you explain what's shown here?
>
> A. This is one of the slides that you may recall that Dr. Burger used to show that this product invalidated the claim. If you'll notice, these are all just lines between boxes. There's no messages drawn out or anything other than lines connected to boxes. So there's no way to really know how this product works.
>
> Q. Is there a difference between links between boxes and messages?
>
> A. Yes, definitely. There might be a totally different reason to have a connection between two boxes than to send messages.
>
> Q. . . . so in summary, do you believe the MMCX prior art invalidates the asserted claims of the '279 and '589 patents?
>
> A. No. There's – there's no detail in this document and what Dr. Burger showed you to even get close to that. So I don't believe that the MMCX product invalidates the asserted claims of the '279 or the '589 patent.

(1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 202–03).

The jury was free to weigh the competing testimony and weigh the credibility of the witnesses. Ultimately, the jury agreed with Genband's expert. After consideration of the

admitted evidence, including evidence regarding whether the MMCX system disclosed the limitations for which it was being relied upon, the jury found that the asserted claims were valid. The Court will not now supplant the jury's judgment. Applying the clear and convincing standard, the jury found that the asserted claims were not invalid. The Court does not find that no reasonable jury could have found the asserted patents were valid based on the presented evidence. Accordingly, Metaswitch's Motion for Judgment as a Matter of Law in regard to invalidity of the '279 and '589 Patents in light of the MMCX system is **DENIED**.

ii.    *Bayer does not anticipate the '279 and '589 Patents*

Metaswitch argues that its expert's unrefuted testimony established that Bayer was published at least by 1997 and that Bayer discloses each limitation of the asserted claims. (JMOL at 28.) Metaswitch argues that Bayer discloses the claim element of a user interface with selectors for call control that is capable of establishing calls between the phone controlled by the user interface and other phones. (*Id.*) (citing DX-499.529, .392). However, for the remaining limitations, Metaswitch does not cite any evidence that demonstrates that the trial evidence meets the heightened requirement of clear and convincing evidence with an "overwhelming effect" such that no reasonable juror could disagree. *See Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1322–23 (Fed. Cir. 2016); *Grey v. First Nat'l Bank in Dallas*, 393 F.2d 371, 380 (5th Cir. 1968).

As with the MMCX reference, Genband argues that Metaswitch failed to identify any message flow diagrams or other disclosures showing the claimed arrangement of messages in Bayer. Genband further submits that its expert, Mr. Lanning, testified that the claimed arrangement was not disclosed by Bayer (JMOL Resp. at 29) (citing 1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 203–04). Indeed, Mr. Lanning explained that Bayer only disclosed sending messages to local devices and did not disclose transmitting messages over a data network to a remote device, as required by the claims:

A: . . . In Bayer, the book, what's disclosed is there's no remote system. That's a big problem with the Bayer reference. The Bayer reference is disclosing communication between phones that are wired together between a PC and another computer.

Q. And what have you shown here from -- on Pages 472 to 473 of Defendants' Exhibit 629?

A. Again, I provided text and diagrams out of the Bayer book, which describes what I just explained to you. Specifically, what I have highlighted are CTI messages from the switch.

Now, we have to figure out what the switch is. The switch is the box on the left with the extra – that's the switch. Appropriately delivered through a LAN-based communication path. That's the wires or lines that are drawn in yellow between the CTI server and the client computer.

Well, the client computer is the PC that you see. There's no disclosure of any kind of remote telephone or remote device here.

(1/14/2016 P.M. Trial Tr. (Lanning), Dkt. No. 474 at 204). Having been presented with evidence that Bayer did not disclose the claimed arrangement of messages and commands, the jury had substantial evidence that Bayer does not anticipate the claims of the '279 and '589 Patents.

The jury was free to weigh the competing testimony and weigh the credibility of the witnesses. Ultimately, the jury agreed with Genband's expert. After consideration of the admitted evidence, including evidence regarding whether Bayer disclosed the limitations for which it was being relied upon, the jury found that the asserted claims were valid. The Court will not substitute Metaswitch's judgment for that of the jury. Applying the clear and convincing standard, the jury found that the asserted claims were not invalid. The Court does not find that no reasonable jury could have found the asserted patents were valid based on the presented evidence. Accordingly, Metaswitch's Motion for Judgment as a Matter of Law in regard to invalidity of the '279 and '589 Patents in light of Bayer is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds no compelling basis upon which the jury's verdict with regard to liability or invalidity should be disturbed.  Though permitted when the elevated demands of Federal Rule of Civil Procedure 50 are clearly met, Courts should always tread lightly and carefully when asked to disregard the considered decision of a properly empaneled jury; especially when considered within the context of the constitutional guarantees of the Seventh Amendment within the Bill of Rights.

The jury's verdict in this case is supported by adequate evidence presented at trial, and should stand unchanged. Accordingly, Metaswitch's Rule 50(b) Renewed Motion for Judgment as a Matter of Law (Dkt. No. 537) is **DENIED** in all respects.

**So ORDERED and SIGNED this 29th day of September, 2016.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE