# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|                                           |   |                          |
|-------------------------------------------|---|--------------------------|
|                                           | § |                          |
| GENBAND US LLC,                           | § |                          |
|                                           | § |                          |
| *Plaintiff*,                              | § |                          |
|                                           | § |                          |
| v.                                        | § | CASE NO. 2:14-cv-33-JRG  |
|                                           | § |                          |
| METASWITCH NETWORKS LTD;                  | § |                          |
| METASWITCH NETWORKS CORP.,                | § |                          |
|                                           | § |                          |
| *Defendants*.                             | § |                          |
|                                           | § |                          |

## <u>ORDER AND OPINION WITH</u>
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On March 29, 2016, the Court held a bench trial and heard evidence in this patent infringement case. Before the Court are several equitable remedies and defenses raised by the Parties, in addition to open questions of law under 35 U.S.C. § 101.

The first set of issues before the Court relate to Genband's request for a permanent injunction. As part of this request, Genband filed a Motion to Alter or Amend the Judgment to Include a Permanent Injunction (Dkt. No. 491.) In response, Metaswitch asserts the equitable defense of laches.

The second set of issues before the Court relate to equitable defenses raised by Metaswitch: the defense of laches (which Metaswitch contends bars Genband from receiving a permanent injunction and recovering pre-suit damages) and unenforceability of several patents due to the equitable doctrines of implied waiver, equitable estoppel, and implied license.

The parties have submitted briefs, supporting documents, expert reports, and proposed findings of fact and conclusions of law. The Court, having considered the same, now makes and enters the following findings of fact and conclusions of law.

I.   **FINDINGS OF FACT ("FF")** ................................................................. **6**

    A.   The Parties .................................................................................................6

    B.   The Lawsuit ...............................................................................................7

        1.   The Patents..........................................................................................7

        2.   The Jury Trial.....................................................................................10

        3.   The Bench Trial .................................................................................11

    C.   Accused Metaswitch Products ................................................................12

    D.   Genband's Knowledge of Metaswitch and Its Products .........................13

        1.   The Court finds that there was delay .........................................13

        2.   The Court finds that the minimal amount of Metaswitch's infringing activity and the circumstances surrounding Genband's CVAS acquisition are sufficient to rebut any presumption or showing of unreasonable delay..................................................................16

    E.   Nortel's History and Knowledge of Metaswitch's Products ..................17

        1.   The Court finds that the minimal amount of Metaswitch's infringing activity and the circumstances surrounding Nortel's bankruptcy are sufficient to rebut any presumption or showing of unreasonable delay.............................................................................17

    F.   Prejudice to Metaswitch...........................................................................20

        1.   Economic Prejudice ..........................................................................20

        2.   Evidentiary Prejudice ........................................................................23

    G.   Nortel and Genband's Involvement in CableLabs...................................26

        1.   Agreements between CableLabs and NNCSI ....................................26

        2.   CableLabs IPR Agreement ................................................................28

        3.   Metaswitch's "alter ego" theory .......................................................30

        4.   Metaswitch's knowledge ...................................................................36

    H.   IETF .........................................................................................................38

        1.   Metaswitch does not have a license to any asserted claim under the IETF Statement because it failed to show that the asserted claims are essential to an IETF standard. ...................................................39

        2.   Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that Nortel contributed a document to the IETF describing the patented technology..........................................................................................41

　　　3.　　Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that its accused products comply with an IETF standard. .................................................42

　　　4.　　Metaswitch does not have a license to any asserted claim under the IETF Statement because it failed to show that the asserted claims are essential to an IETF standard. ...................................................43

　　　5.　　Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that Nortel contributed a document to the IETF describing the patented technology. ................................................................................47

　　　6.　　Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that its accused products comply with an IETF standard. .................................................48

　　I.　　ITU ...............................................................................................51

　　　1.　　Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to show that Nortel contributed its patented technology to the relevant ITU Recommendations. ................................................................52

　　　2.　　Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to prove that its accused products comply with the relevant ITU Recommendations. ........52

　　　3.　　Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to prove that the claim is essential to the relevant ITU Recommendations. ...................53

**II.　　CONCLUSIONS OF LAW ("CL")** ....................................................... **54**

　　A.　　Permanent Injunction: Availability ...........................................................55

　　　4.　　Legal Standard ..........................................................................55
　　　5.　　Irreparable Harm ........................................................................55

　　B.　　Defense of Laches .........................................................................58

　　　1.　　Legal Standard ..........................................................................58
　　　2.　　Analysis ................................................................................61

　　C.　　Equitable Defense: Implied Waiver .........................................................62

　　　1.　　Applicable Law .........................................................................62
　　　2.　　The Court concludes that Metaswitch has not proven by clear and convincing evidence that implied waiver bars Genband's damages. ........63

　　D.　　Equitable Defense: Equitable Estoppel .....................................................64

　　　1.　　Applicable Law .........................................................................64

2. The Court concludes that Metaswitch has not proven by clear and convincing evidence that equitable estoppel bars Genband's damages.................................................................................66

E. Equitable Defense: Implied License ......................................................68

 1. Applicable Law...............................................................................68

 2. The Court concludes that Metaswitch has not proven by clear and convincing evidence that implied license bars Genband's damages. ........68

F. Patent Eligible Subject Matter under 35 U.S.C. § 101 .........................69

 1. Legal Standard ................................................................................69

 2. '561 Patent Asserted Claims are Patent Eligible ......................72

 3. '658 Patent Asserted Claims are Patent Eligible ......................73

# I.  FINDINGS OF FACT ("FF")

## A.  The Parties

**[FF1]**    Plaintiff Genband US LLC ("Genband") is a Delaware corporation and a real time communications software company formed in 1999, having a principal place of business in Frisco, Texas.  (Dkt. No. 12 at 1; PX4037 ("Bakewell Op. Rpt.") at ¶ 29.)

**[FF2]**    Genband was founded in 1999 under the name General Bandwidth.  *Id.* at ¶ 20. In 2001, General Bandwidth introduced its first product, the VG-100.  In 2006, General Bandwidth was renamed Genband.  *Id.*  In December 2009, Genband submitted a bid for Nortel Networks Inc.'s ("Nortel") Carrier VoIP and Application Solutions ("CVAS") business, and Genband acquired the CVAS business on May 28, 2010.  *Id.* at ¶ 23.  Nortel's CVAS business offered a variety of voice over packet products (*i.e.*, softswitches and media gateways), multimedia communication servers, application servers, IMS products, optical products, WAN switches and digital-based telephone switches.  *Id.* at ¶ 24.  As part of the CVAS business unit acquisition, Genband gained intellectual property assets, including five of the seven patents asserted in this litigation.  *Id.* at ¶¶ 24–25.

**[FF3]**    Defendant Metaswitch Networks Ltd ("Metaswitch Ltd") is a privately held communications software company formed in 1981 with its principal place of business in the United Kingdom.  (DX-230 at -563.)

**[FF4]**    Metaswitch Networks Corp. ("Metaswitch Corp.") is a wholly owned U.S. subsidiary of Metaswitch Ltd with its principal place of business located in San Francisco, California.  (Metaswitch Networks Ltd and Metaswitch Corp., collectively "Metaswitch"). (Dkt. No. 12 at ¶ 3–4; *see* also DX-230 at -1608.)  Metaswitch provides software solutions for voice and data communications for telecom equipment manufacturers.  Metaswitch offers a line of

softswitches, media gateways, application servers, and session border control products to telecommunication operators. Bakewell Op. Rep. at ¶¶ 43–44.

## B. The Lawsuit

[FF5]    On January 21, 2014, Genband filed the original complaint in this case. Dkt. No. 1. In this complaint, Genband alleged that certain Metaswitch products infringed U.S. Patent Nos. 6,772,210, 6,791,971, 6,885,658, 6,934,279, 7,995,589, 7,047,561, 7,184,427 and 7,990,984. *Id.*

### 1. The Patents

[FF6]    Genband asserts seven patents: U.S. Patent Nos. 6,791,971 ("'971 Patent"); 6,885,658 ("'658 Patent"); 6,934,279 ("'279 Patent"); 7,047,561 ("'561 Patent"); 7,184,427 ("'427 Patent"); 7,990,984 ("'984 Patent"); and 7,995,589 ("'589 Patent") (collectively, the "patents-in-suit").

[FF7]    The '971 Patent is entitled "Method and Apparatus for Providing a Communications Service, for Communication and for Extending Packet Network Functionality." PX2. The application for the '971 Patent was filed on December 1, 1999, and the '971 Patent issued on September 14, 2004. *Id.* The inventors listed on the face of the '971 Patent are Marwan Osman and Antoine Zoghbi. *Id.* Genband asserts Claims 70, 80, and 92 of the '971 Patent.

[FF8]    The '561 Patent is entitled "Firewall for Real-Time Internet Applications." PX5. The application for the '561 Patent was filed on September 28, 2000, and the '561 Patent issued on May 16, 2006. *Id.* The sole inventor listed on the face of the '561 Patent is Michael C. G. Lee. *Id.* Genband asserts Claims 6, 17, and 20 of the '561 Patent.

**[FF9]**   The '279 and '589 Patents are both entitled "Controlling Voice Communications over a Data Network."  PX0004, PX0008.  The '589 Patent is a continuation of the '279 Patent.  PX0008.  The application for the '279 Patent was filed on March 13, 2000, and the '279 Patent issued on August 23, 2005.  PX0004.  The application for the '589 Patent was filed on August 23, 2005, and the '589 Patent issued on August 9, 2011.  PX0008.  The inventors listed on the face of the '279 and '589 Patents are Patrick N. Sollee, David R. Creech, Gregory T. Osterhout, and Christopher L. Jessen.  PX0004, PX0008.  Genband asserts Claim 25 of the '279 Patent and Claim 15 of the '589 Patent.

**[FF10]**   The '427 and '984 Patents are both entitled "System and Method for Communicating Telecommunication Information from a Broadband Network to a Telecommunication Network."  PX0006, PX0007.  The application for the '427 Patent was filed on November 28, 2000, and the '427 Patent issued on February 27, 2007.  PX0006.  The application for the '984 Patent was filed on February 27, 2007 and issued on August 2, 2011.  PX0007.  The inventors listed on the face of the '427 and '984 Patents are A. J. Paul Carew and Brendon W. Mills.  PX0006, PX0007.  Genband asserts Claim 1 of the '427 Patent and Claim 1 of the '984 Patent.

**[FF11]**   The '658 Patent is entitled "Method and Apparatus for Interworking Between Internet Protocol (IP) Telephony Protocols."  PX0003.  The application for the '658 Patent was filed on February 18, 2000, and the '658 Patent issued on April 26, 2005.  PX0003.  The inventors listed on the face of the '658 Patent are David P. Ress, Xuewen Li, Denise J. Ingram, and Gregory Robert Utas.  PX0003. Genband asserts Claims 1 and 11 of the '658 Patent.

**[FF12]**   The '658 Patent claims are directed towards the practice of protocol interworking through the use of an abstraction or "interworking protocol."  (May 8, 2015 Expert

Report of E. Burger, ¶ 130.)  The '658 Patent involves mapping the information contained in an incoming signal of an inbound signaling protocol into a messages of an intermediary protocol, which the '658 Patent calls an "agent interworking protocol."  (*Id.*)  From there, the information, which is now represented in the format of the interworking protocol, can be mapped to any other protocol so that the information may be transmitted in an outgoing message of a desired outbound signaling protocol.  (*Id.*)

**[FF13]**    Claims 1 and 11 of the '658 Patent, which Genband asserts, recite a call server and method:

1.  A call server comprising:

    (a)    a fist protocol agent for communicating with a first internet protocol (IP) telephony device according to a first IP telephony protocol;

    (b)    a second protocol agent for communicating with a second IP telephony device according to a second IP telephony protocol; and

    (c)    an interworking agent for providing functions usable by the first and second protocol agents to communicate with each other according to a third protocol, the functions provided by the third protocol being a superset of functions provided by the first and second IP telephony protocols, said interworking agent further adapted to determine that a first parameter associated with the first IP telephony protocol does not map to the second IP telephony protocol and communicating first parameter to the second protocol agent without alteration.


11. A method for interworking devices that communicate using different internet protocol (IP) telephony protocols, the method comprising:

    (a)    receiving, from a first telephony device, a first message formatted according to a first IP telephony protocol;

    (b)    in response to receiving the first message, generating a second message, formatted according to a second protocol, said second protocol being distinct from said first protocol, the second message including at least one of a media capabilities description and media stream management information derived from the first message;

    (c)    transmitting the second message to a second protocol agent; and

(d)  in response to receiving the second message, generating a third message formatted according to a third IP telephony protocol, the third message including at least one of the media capabilities description and media stream management information derived from the second message.

(DX-005, '658 Patent at Claim 1, Claim 11.)

**[FF14]**  Genband acquired the rights to enforce the patents at different times.

**[FF15]**  Genband owned the '984 and '589 Patents at the time they issued in August 2011.  PX7 and PX8.  Thus,  Genband first obtained rights to enforce these patents approximately three years before the filing of this lawsuit.

**[FF16]**  Genband acquired rights to enforce the '561, '658, '971, and the '279 Patents in May 2010.  *See* PX34.  Thus, Genband first obtained rights to enforce the '561, '658, '971, and '279 Patents approximately four years before the filing of this lawsuit.

**[FF17]**  Genband owned the '427 Patent at the time it issued on February 27, 2007. PX6.  Thus, Genband first obtained rights to enforce the '427 Patent approximately seven years before the filing this lawsuit.

### 2.  The Jury Trial

**[FF18]**  During January 11–15, 2016, the Court held a jury trial on Genband's infringement claims. The Jury also heard Metaswitch's patent defenses, which included non-infringement, invalidity, and arguments that it was entitled to a license to certain patents on royalty-free terms.  The patent claims at issue at the jury trial were:

- '971 Patent:  Claims 70, 80, and 92
- '658 Patent:  Claims 1 and 11
- '279 Patent:  Claim 25
- '589 Patent:  Claim 15
- '561 Patent:  Claims 6, 17, and 20
- '427 Patent:  Claim 1
- '984 Patent:  Claim 1

(Dkt. No. 465.)

**[FF19]**    On January 15, 2016, the Jury found that Metaswitch infringes all asserted claims of Genband's seven patents and that those claims are valid.   (Dkt. No. 465, "Jury Verdict").  The Jury awarded $8,168,400 in damages.  (*Id.*)

**[FF20]**    On January 26, 2016, the Court entered a Final Judgment in accordance with the jury verdict. (Dkt. No. 480, "January 26, 2016 Final Judgment.")

**[FF21]**    On February 5, 2016, the Court set aside the January 26, 2016 Final Judgment pending a final determination of Metaswitch's equitable defense to Genband's patent infringement claims, noting that those equitable issues would be heard in a subsequent bench trial, and that after the bench trial, the Court would re-enter judgment in light of both the jury's verdict and the bench trial. (Dkt. No. 492.)

### 3.    The Bench Trial

**[FF22]**    On March 28, 2016, the day before the bench trial, the Parties filed a joint notice of stipulations for the bench trial.  (Dkt. No. 538.) As part of the stipulation, the parties agreed to waive objections to the admission of any exhibit identified on a bench trial exhibit list that was "pre-admitted" in the jury trial in this case. (*Id.*) The parties further agreed to waive any hearsay objection to expert reports that were timely served in this case. (*Id.*) The parties therefore agreed that such expert reports are admissible as evidence in the bench trial and agreed not to call any expert witnesses live during the bench trial. (*Id.*)

**[FF23]**    On March 29, 2016, the Court held a bench trial on Genband's claim for a permanent injunction, Metaswitch's equitable defenses (including laches, implied waiver, equitable estoppel, and implied license), and Metaswitch's defense of invalidity of the '561 and '658 Patents under 35 U.S.C. § 101. (Dkt. No. 543.)

[FF24]   During the bench trial, the Court also took under advisement Genband's motion to alter or amend the judgment to include a permanent injunction (Dkt. No. 491). The Court also took under advisement Genband's objections to testimony Metaswitch submitted relating to the permanent injunction and equitable defenses, i.e.: the declaration of Lance E. Gunderson (Dkt. No. 510), the declaration of Alastair Mitchell (Dkt. No. 511), and the declarations of Jennifer Kash (Dkt. No. 545).

[FF25]   Pursuant to the Court's order, the parties filed post-bench-trial briefs on April 12, 2016. (Dkt. Nos. 552, 553.)

## C.   Accused Metaswitch Products

[FF26]   Genband accuses Metaswitch of infringing the following patent claims via these Metaswitch products:

- **'561 Patent Claims 6, 17, and 20:**
  - Perimeta Session Border Controller (Dkt. No. 470, 1/12/2016 P.M. Trial Tr. at 29:20–30:16; 38:14–16; 44:15–24);
- **'971 Patent Claims 70, 80, and 92:**
  - Call Feature Server (*id.* at 98:24–99:8; 104:23–105:24; 108:25–109:15),
  - Integrated Softswitches VP2510, VP3500, VP3510, VP6010, and VP6050 (*id.* at 98:24–99:8; 104:23–105:24; 108:25–109:15),
  - Service Broker (*id.* at 98:24–99:8; 108:25–109:15);
- **'279 Patent Claim 25 and '589 Patent Claim 15:**
  - MTAS platform with Accession Software supporting Call Jump (*id.* at 122:16–19; 124:3–8),
  - MTAS platform with CommPortal Software supporting Click to Dial (*id.* at 128:1–19; 130:15–18);
- **'658 Patent Claims 1 and 11:**
  - Call Feature Server (*id.* at 138:25–139:15; 149:20–24; 157:12–158:20),
  - Integrated Softswitches VP2510, VP3500, VP3510, VP6010, and VP6050 (*id.*);
- **'984 Patent Claim 1 and '427 Patent Claim 1:**
  - Universal Media Gateways MG2510, MG3500, MG3510, MG6010, and MG6050 (*id.* at 166:10–167:2; 181:1–4; 187:17–188:7),
  - Integrated Softswitches VP2510, VP3500, VP3510, VP6010, and VP6050 (*id.*).

**[FF27]** Mr. John Lazar testified on behalf of Metaswitch that Perimeta was not available before July 2011. (Dkt. No. 472, 1/13/2016 P.M. Trial Tr. at 205:3–6; PX167.)

### D. Genband's Knowledge of Metaswitch and Its Products

#### 1. The Court finds that there was delay

**[FF28]** As early as 2001, Genband was aware of Metaswitch. The parties participated in an interoperability consortium called Open VoB. (Dkt. No. 502-4 ¶ 9.) Former Genband CEO Charlie Vogt, who ran the company for eight and half years up to 2013, knew Metaswitch's product offerings and had a general sense of the functionalities included in Metaswitch products. (Dkt. 503-4 at 37–38, 118–19.) Vogt joined Genband in July 2004. (*Id.* at 37.) He was aware of Metaswitch prior to joining Genband. (*Id.*)

**[FF29]** Genband contends that, while Genband was aware of Metaswitch prior to filing its complaint, Genband was not aware that Metaswitch's products infringed its patents until just prior to filing its original complaint. (Dkt. No. 503-2, "Jarzemsky Tr.," at 129:4-7.)

**[FF30]** However, the Genband marketing department monitored Metaswitch press releases regarding new Metaswitch products. (Dkt. No. 503-2.) Upon learning of a new product, the marketing department would conduct a competitive analysis that involved "comparing Genband products to Metaswitch products." (*Id.*)

**[FF31]** Accordingly, Metaswitch contends that Genband has known about the accused products, as well as the "features and services claimed by the Metaswitch products," in this case since at least as early as the first date that those products were announced by Metaswitch. (Dkt. No. 503-2.)

**[FF32]** The Court finds that such knowledge by the marketing department is sufficient to show that Genband knew of these accused products.

**[FF33]**    The accused products were publicly disclosed at least as early as the below dates.  (Dkt. No. 502-4, "Mitchell Feb. 24, 2016 Decl.")

| Product | United States Launch Date |
| --- | --- |
| VP3500 Integrated Softswitch | Publicly announced in May 2002.  Generally available October 2002. |
| VP3510 Integrated Softswitch | May 2004 |
| MG3510 Universal Media Gateway | Publicly announced in June 2004.  Generally available in December 2004. |
| Call Feature Server | December 2004 |
| Enhanced Application Server | March 2005 |
| MG3500 Universal Media Gateway | December 2004 |
| DC-SBC | November 2005 |
| VP2510 Integrated Softswitch | January 2006 |
| MG2510 Universal Media Gateway | January 2006 |
| CommPortal | April 2007 |
| Service Broker | AppTrigger's launch of Service Broker:  at least as early as 2007<br><br>Metaswitch launch of Service Broker: March 2010 |
| Perimeta Session Border Controllers | July 2011 |
| VP6010 Integrated Softswitch | April 2012 |
| VP6050 Integrated Softswitch | July 2012 |
| Accession Communicator | February 2012 |
| MG6010 Universal Media Gateway | April 2012 |
| MG6050 Universal Media Gateway | July 2012 |
| MetaSphere Multiservice Telephony Application Servers | MetaSphere MTAS is a branding name that includes Metaswitch's Call Feature Server and Enhanced Application Server.  This branding change occurred in 2007. |

**[FF34]**    The following features were publicly disclosed at least as early as the dates described below.  (Dkt. No. 502-4.)

| Feature | Publicly Described |
|---|---|
| Session Border Controller's separate handling of signaling and media traffic | First publicly described at least as early as 2005. |
| Session Border Controller's application of packets associated with the signaling and control channels to an application proxy and application of packets associated with the bearer (media) channel to a packet filter | First publicly described at least as early as 2005. |
| Session Border Controller's intelligent firewall functionality for real-time applications, such as VoIP | First publicly described at least as early as 2005. |
| The ability for softswitches and Call Feature Servers to provide intelligent networking services, such as toll-free calling, using legacy intelligent network equipment in an IP Environment | First publicly described at least as early as 2007. |
| Click to dial | First publicly described at least as early as 2007. |
| The ability to add support for additional protocols to its Call Feature Servers (as stand-alone products and as part of an Integrated Softswitch) by creating a mapping of the new protocol to a common, interworking protocol | First publicly described at least as early as 2004. |
| Communicating telecommunication information between an IP or ATM broadband network and a telecommunication network (e.g., the PSTN) | First publicly described at least as early as 2002. |

[FF35]    Genband produced internal documents dating back to 2007 analyzing Metaswitch's products.  (Dkt. No. 503 Exs. 5–9.)

[FF36]    Genband's engineers believed "most of the people in the space," including Metaswitch, were infringing Genband patents.  (Dkt. No. 503-4 at 113–14.)  However, Genband did not sue Metaswitch or others companies that its engineers believed to be infringing.  (*Id.* at 120–21.)  Genband's former CEO believed it was best to use patents "as a way of defending ourselves" unless "we were being eliminated in our ability to fairly compete in the market."  (*Id.*

at 122:4–24.)  Genband's current CEO, David Walsh, testified that he personally believed Metaswitch was potentially infringing in February 2011.  (Dkt. No. 503-10 at 141–44.)

> ## 2. The Court finds that the minimal amount of Metaswitch's infringing activity and the circumstances surrounding Genband's CVAS acquisition are sufficient to rebut any presumption or showing of unreasonable delay.

**[FF37]**  Before Genband acquired CVAS in 2010, the only asserted patent owned by Genband was the '427 Patent.  *See* [FF14]–[FF17].

**[FF38]**  It is reasonable that Genband was not aware of and did not investigate any possible infringement by Metaswitch of the '427 Patent because the two companies were not major competitors and any infringement by Metaswitch was minimal.  Before Genband acquired CVAS in 2010, Mr. Lazar testified that Genband and Metaswitch had a friendly relationship:

> Q.  And could you tell us what the relationship was between Metaswitch and Genband during the early to mid 2000s?
> A.  We'd run into them sometimes.  **The relationship was reasonably friendly.**
> Q.  Did that change at some point in time?
> A.  Yeah.  I mean, I think during the -- the mid 2000s, I knew the chief executive, Charlie Vogt, reasonably well.  We -- we would talk to each other a couple of times a year. **I would say it began to change after the CVAS acquisition.**
> Q.  And when you say "after the CVAS acquisition," what do you mean?
> A.  **I think it began to get a -- it began to get much, much more competitive**.
> Q.  Because -- and that's because Genband acquired the CVAS unit?
> A.  I don't know if it's directly linked to that, but I think so.

1.13.16 p.m. Trial Tr. at 168:2–18.  He testified that Genband and CVAS became "fierce competitors" in 2013 or 2014:

> Q.  . . . and I think that the quotation from your deposition was that -- the fact that Genband and Metaswitch were fierce competitors.
> A.  Yeah.  I think as of 2013, 2014, that would be true.
> Q.  Prior to 2013 or 2014, did you view them as a fierce competitor?
> A.  Less so.

1.13.16 p.m. Trial Tr. at 168:25–169:6.

**[FF39]**  After Genband acquired CVAS, it is reasonable that Genband was not aware of and did not investigate any possible infringement by Metaswitch because (1) Genband was pre-

occupied with absorbing the newly acquired company; (2) as a much larger company with a broader product portfolio, Genband did not view Metaswitch as a major competitor; and (3) Metaswitch's infringing activity was minimal.

**[FF40]**   Mr. McCready, Genband's Executive Vice President, testified that the magnitude of the Nortel acquisition was significant:

> Q  And how -- how did Genband's business change, if at all, when it acquired CVAS?
> A  Well, it changed dramatically. You know, the company had effectively one main product line.
>       Now, it had a broad portfolio of products. The number of employees increased by a factor of, I think, four or five times, so did the revenue. Primarily, sales had been to these large integrators in the United States.
>       Now, Genband had hundreds of companies -- pardon me -- hundreds of customers that it was servicing directly, and around the world, it became a global company in that step. It was truly transformational.

(3/29/2016 Bench Trial Tr., Dkt. No. 542, at 73:12–23.)

**[FF41]**   Genband's former CEO Mr. Vogt testified that, as of 2008, Genband did not consider Metaswitch one of the two competitors for the SBC market. (3/29/2016 Bench Trial Tr., Dkt. No. 542, at 206:24–207:2.)

### E.   Nortel's History and Knowledge of Metaswitch's Products

### 1.   The Court finds that the minimal amount of Metaswitch's infringing activity and the circumstances surrounding Nortel's bankruptcy are sufficient to rebut any presumption or showing of unreasonable delay.

**[FF42]**   To the extent that Nortel had or should have had knowledge of Metaswitch's infringement, Genband has rebutted the presumption that any delay in filing suit was unreasonable.  The Court finds that the minimal amount of Metaswitch's infringing activity and Nortel's bankruptcy are sufficient to put the existence of any presumed delay into genuine dispute.

**[FF43]** In 2000, Nortel held a leading position in optical systems and the Internet and communications field. Bakewell Op. Rpt. at ¶ 35. When Nortel owned the '561, '658, '971, '279, and '589 Patents, Metaswitch was small, and Nortel did not view Metaswitch as a major competitor. It is reasonable that Nortel was not aware of and did not investigate any possible infringement by Metaswitch.

**[FF44]** Nortel has known about Metaswitch and its products since at least 2002. In 2002, Metaswitch and Nortel discussed a possible merger, and Metaswitch sent documents under a non-disclosure agreement to Nortel describing Metaswitch's products in depth. (Dkt. No. 505 ¶¶ 4–9; DX-547.) Following these communications, and beginning in early 2003, representatives of Nortel conducted an in-depth and "complete evaluation" of at least Metaswitch's accused VP3500 and VP3510 products for the purpose of determining whether to acquire Metaswitch. *See* (Dkt. No. 503-2 at 30–33; Dkt. 505.) Nortel sent employees to Metaswitch's facilities in the United Kingdom to learn more about Metaswitch's products. (Dkt. No. 503-2 at 202–03.) Metaswitch provided Nortel with a demonstration of its hardware. (*Id.* at 203; Dkt. No. 505.) Nortel was "very impressed with the thoroughness of the Metaswitch team." (Dkt. No. 503-2 at 192.)

**[FF45]** Nortel negotiated for a potential license to Metaswitch technology in 2002–2006, including Metaswitch's VP3XXX, which would include the softswitches Genband accused of infringement in this case. (Dkt. No. 505 ¶¶ 4–28; Dkt. No. 505-19; Dkt. No. 505-28.)

**[FF46]** Even as late as 2006, Metaswitch was a small player in terms of worldwide market share, non-Class 5 applications, and media gateways. PX-399.0003. Although Metaswitch had gained some market share in one market space (North America Class 5 softswitch market), its market share was still insignificant compared to Nortel. PX-399.0002.

**[FF47]**    In 2006, Metaswitch itself recognized that it was a small player in the market, that Nortel did not view it as a threat, and that Nortel was not aware of its possible patent infringement.  In a April 12, 2006 email, Lancelot Robson, a Metaswitch engineer, stated:

> I wonder how long before Nortel considers Data Connection to be
> a threat and lets the lawyers loose on us?

PX-399.0002; (3/29/2016 Bench Trial Tr., Dkt. No. 542, at 151–52).  Dave Reekie, who was responsible for the engineering department at the time, commented, "[T]here probably isn't a whole lot we can do differently right now anyway!"  PX-399.0001; (3/29/2016 Bench Trial Tr., Dkt. No. 542, at 152–53).

**[FF48]**    Nevertheless, it is reasonable that Nortel was not aware of and did not investigate any possible infringement by Metaswitch, because between 2004 and 2010, Nortel was facing significant economic challenges that ultimately resulted in its bankruptcy.  By 2004, Nortel was facing significant challenges in its business. As a result, it reduced its workforce. Those reductions totaled 5,750 employees by-mid 2005.  Bakewell Op. Report at ¶ 37.  In February 2008, Nortel announced plans to reduce their workforce by an additional 2,100 positions.  *Id.*  In January 2009, the Board voted to declare bankruptcy.  Nortel filed for bankruptcy in Canada, the U.S. and the United Kingdom.  *Id.* at ¶ 37.  Once in bankruptcy, Nortel could not file a lawsuit without approval from the bankruptcy court.  In April 2009, Nortel determined that it could not feasibly re-emerge from bankruptcy and decided to sell its business units.  In the years that followed, Nortel divested itself of its operations.  *Id.*  In December 2009, Genband acquired the CVAS business unit of Nortel.  By the end of 2011, most substantial Nortel assets had been sold to other entities and the corporation was split into regional entities to continue final wind down procedures.  *Id.* at ¶ 37.

**[FF49]**　In December 2009, Genband entered into a "Stalking Horse Agreement" with Nortel to purchase substantially all the assets of Nortel's CVAS business, including the '971, '658, '279, '589 and '561 Patents, the "Additional Transferred Patents." (DX-240, DX-314.)

## F.　Prejudice to Metaswitch

### 1.　Economic Prejudice

**[FF50]**　Metaswitch cannot show that it would have avoided any increased expenditure in making and selling the accused products if Genband had brought suit earlier. Metaswitch has not identified any specific evidence of economic prejudice.

**[FF51]**　Metaswitch would not have changed its conduct if Genband had sued sooner. Even in this case, Metaswitch did change its conduct or take any action to change the design of its products after Genband filed suit in 2014. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1375 (Fed. Cir. 2010) (finding no economic prejudice where the accused infringer failed to show increased expenditures in making and selling its accused product that would have been avoid if the patentee filed suit earlier, and the accused infringer's reliance on a non-infringement opinion of counsel showed that it would not have changed its conduct if the patentee filed suit earlier, therefore affirming denial of accused infringer's JMOL motion that laches applied).

**[FF52]**　Genband served a Rule 30(b)(6) notice of deposition to Metaswitch. Topic No. 42 of that notice reads:

> 42. Any discussed, considered, planned, potential, or implemented design-around or non-infringing alternative to any claim of the Asserted Patents, including the availability, acceptability, and costs associated with each design-around or non-infringing alternative.

Genband US LLC's Notice of Deposition to Metaswitch Networks Ltd And Metaswitch Networks Corp. at 12. Metaswitch's 30(b)(6) corporate designees for this topic testified consistently that Metaswitch had no plan to design around any of the asserted patents.

**[FF53]**    Alastair Mitchell is Metaswitch's senior vice president of business and consumer solutions.  (1/13/2016 P.M. Trial Tr. (Mitchell), Dkt. No. 472, at 175:8-15.)  He is "responsible for overseeing research and development of engineering for several of our products" and "oversee[ing] also the product management teams for those same products." (1/13/2016 P.M. Trial Tr. (Mitchell), Dkt. No. 472, at 175:18-24.)  At the bench trial, Genband presented deposition testimony from Mr. Mitchell that he was not aware of any plans by Metaswitch to change the accused functionality in response to this litigation:

> QUESTION: Do you know if Metaswitch has made any efforts to change the accused functionality in response to Genband filing this lawsuit?
> ANSWER: I don't know.
> QUESTION: So, in other words, you're not aware of any efforts by Metaswitch to change its -- the accused functionality since Genband brought this lawsuit?
> ANSWER: I'm not aware of any efforts, correct.

(3/29/2016 Bench Trial Tr., Dkt. No. 542, at 158.)  In opposing Genband's request for an injunction, Mr. Mitchell submitted a Declaration admitting that Metaswitch did not begin working on any design-around until after the jury verdict: "Metaswitch has worked to implement design around in the accused product lines since the jury verdict in this case."  (Dkt. No. 502-4 at 46.)

**[FF54]**    Duncan Archer is Metaswitch's Director of Product Architecture. (3/29/2016 Bench Trial Tr., Dkt. No. 542, at 155.)  At the bench trial, Genband presented deposition testimony from Mr. Archer that he was not aware of any plans by Metaswitch to change the design of the Universal Media Gateway in response to this litigation:

> Q. Does Metaswitch have any plans to change the design of the universal media gateway in response to this litigation?
> . . .
> A. I'm not currently aware of any such plans.

(3/29/2016 Bench Trial Tr., Dkt. No. 542, at 155.)

**[FF55]**    Oliver Carter has been with Metaswitch for fifteen years and is currently the senior product manager for the Perimeta product.  (3/29/2016 Bench Trial Tr., Dkt. No. 542, at 156.) Mr. Carter testified as Metaswitch's 30(b)(6) witness on several technical topics relating to the Perimeta product, including Topic No. 42.   At his 2015 deposition, he testified that Metaswitch had not taken any action to design around any of the asserted patents, that Metaswitch did not have any plan to design around, and that Metaswitch had not even identified ways to design around:

> Q. Does Metaswitch have any plans to take any action to design around any of the patents involved in this lawsuit?
> A. Not at this point, no.
> Q. Has Metaswitch identified any ways to design around the patents involved in this lawsuit?
> . . .
> A. Not at this point, no.

(3/29/2016 Bench Trial Tr., Dkt. No. 542, at 156.)

**[FF56]**    Jon Rowland is Metaswitch's Director of Engineering.   Mr. Rowland was Metaswitch's 30(b)(6) witness on various technical topics for the call feature server and MTAS, including Topic No. 42 for the Call Feature Server.  At his deposition, which Genband presented at the bench trial, he testified that Metaswitch had not considered changing the design of the Call Feature Server to design around the patents asserted in this lawsuit:

> QUESTION: Has Metaswitch considered changing the design of the call feature server in order to design around the patents asserted in this lawsuit?
> . . .
> ANSWER: No.

(3/29/2016 Bench Trial Tr., Dkt. No. 542, at 156.)

## 2. Evidentiary Prejudice

**[FF57]**   Metaswitch has not established any evidentiary prejudice.  Metaswitch has not detailed what specific evidence it was unable to obtain that it could have obtained had the lawsuit been filed earlier.  Again, Metaswitch has only proffered conclusory statements of evidentiary prejudice, and these are insufficient.

### a)   Inventor testimony

**[FF58]**   Metaswitch alleges that some inventors failed to recall the events surrounding their alleged invention.  Metaswitch FOF, Dkt. No. 356 at ¶ 34.

**[FF59]**   For the '561, '658, '971, '279, and '589 Patents, Genband did not rely on any conception or reduction to practice to establish an earlier date of invention before the filing date of those patents.  So, there can be no prejudice.  Moreover, as to the '279 and '589 Patents, Metaswitch deposed only two of the four named inventors.  It is unlikely that any inventors would have recalled more information if they had been deposed earlier in time.

**[FF60]**   The earliest possible date Genband could have asserted the '561, '658, '971, and '279 Patents was after Genband acquired these patents in May 2010.  *See* PX34.  Genband filed this action on January 21, 2014. (Dkt. No. 1.) Even if these patents were asserted in May 2010, there is no evidence in the factual record that these inventors could have recalled ten-year-old information better than fourteen-year-old information.

**[FF61]**   The earliest possible date Genband could have asserted the '427 Patent was when it issued in February 2007.  PX6.  Genband filed this action on January 21, 2014. (Dkt. No. 1.) However, there is no evidence in the factual record that these inventors could have recalled seven-year-old information better than fourteen-year-old information.

**[FF62]**   The earliest possible date Genband could have asserted the '984 and '589 Patents was when they issued in August 2011.  PX7.  Genband filed this action on January 21,

2014. (Dkt. No. 1.) However, there is no evidence in the factual record that these inventors could have recalled eleven-year-old information better than fourteen-year-old information.

### b) Genband's 30(b)(6) testimony

**[FF63]**   Metaswitch alleges that Genband did not put forward knowledgeable 30(b)(6) witnesses.  Metaswitch FOF, Dkt. No. 356 at ¶ 35.

**[FF64]**   The evidentiary record indicates that Metaswitch has not been prejudiced in its attempts to obtain Genband corporate testimony.  All of Genband's 30(b)(6) witnesses were knowledgeable and reasonably prepared.  *See, e.g.*, Dkt. No. 200 at 2 ( "The Court having determined that Plaintiff designated adequate representatives to testify concerning the topics at issue, and that they were reasonably prepared concerning the knowledge of Plaintiff about the relevant topics, the motion is DENIED.")  Furthermore, there is no evidence in the record that Metaswitch was unable to procure testimony from any former Genband or Nortel employees through subpoenas.

### c) Mr. Vogt and events relating to damages

**[FF65]**   Metaswitch alleges that Mr. Vogt no longer remembered details of events relevant to damages.  Metaswitch FOF, Dkt. No. 356 at ¶ 36.

**[FF66]**   While Mr. Vogt could not recall certain details regarding Genband's licensing practices, the evidentiary record does not establish that Metaswitch could not obtain this information from its discovery of Genband or other parties.  Further, there is no evidence that any of this information is relevant or that Metaswitch's discovery of Genband's licensing activities has been deficient in any respect.

**[FF67]**   Metaswitch complains that Mr. Vogt was asked about what happened to certain Taqua patents during the divestiture from Genband and that he did not know which entity kept these patents and did not know whether a license was given to the non-owning entity.

Metaswitch FOF, Dkt. No. 356 at ¶ 36 (citing Vogt Tr., Dkt. No. 504-20, at 44:7-45:5). But this information is not relevant, because none of the asserted patents are Taqua-based patents.

**[FF68]**    Metaswitch complains that Mr. Vogt did not know whether or not "Keith or Fred would have been privy to [the valuation] discussions." Metaswitch FOF, Dkt. No. 356 at ¶ 36 (citing Vogt Tr., Dkt. No. 504-20, at 141:2-142:1). Mr. Vogt, however, described the valuation process,[1] and the particular issue of whether or not Mr. Landau or Mr. Kemmerer were privy to the valuation conversations is not relevant. Other witnesses could have described the valuation process as well. Moreover, the Court has specifically ruled that Genband's 30(b)(6) witnesses regarding the CVAS acquisition were reasonably prepared. *See, e.g.,* Dkt. No. 200 at 2.

**[FF69]**    Metaswitch complains that, when Mr. Vogt was asked about whether Genband had entered license agreements with third-parties, he answered that he was aware that various licenses had been granted, but he was unsure of the specifics of the negotiations or the parties involved. Metaswitch FOF, Dkt. No. 356 at ¶ 36 (citing Vogt Tr. at 143:10-145:13). Presumably, any such relevant licenses would have been produced in this case. Moreover, Mr. Vogt was not a 30(b)(6) witness on this topic; John McCready was the 30(b)(6) designee on the topic of Genband's licensing practices/rates. Metaswitch did not allege any prejudice due to McCready's lack of memory on this topic.

**[FF70]**    The evidentiary record indicates that Metaswitch has not been prejudiced in its attempts to obtain damages-related information. There has been no showing that Metaswitch has been unable to obtain sufficient information from the depositions it took pursuant to these topics.

---

[1] Metaswitch cannot complain that Mr. Vogt did not provide the particular internal assessment. When Mr. Vogt stated, "I don't think it's fair for me to say," Metaswitch's counsel told him, "Okay. Well, I mean, so -- I mean, it's okay if you -- if you don't feel comfortable saying something" Vogt. Tr., Dkt. No. 504-20, at 139:8-13. In any case, Mr. Vogt volunteered, "It was significant." Vogt. Tr., Dkt. No. 504-20, at 139:14.

### d) Nortel bankruptcy

**[FF71]**    Metaswitch complains that the Nortel bankruptcy complicated the production of documents.  Metaswitch FOF, Dkt. No. 356 at ¶ 37.  The evidentiary record indicates that Metaswitch has not been prejudiced in its attempts to obtain information from Nortel.  Further, the evidence of record indicates that Genband has properly complied with its discovery obligations associated with Nortel. *See* Dkt. Nos. 200 and 213.  The only evidence that Metaswitch claims that it did not receive was the Electronic Data Room.  Metaswitch FOF, Dkt. No. 512 at ¶ 16. There is no evidence of how long the data room was maintained and whether or not it could have been available in the past.

### e) Tekelec and NextPoint

**[FF72]**    Metaswitch complains that Genband was unable to produce documents relating to its acquisition of Tekelec and NextPoint.  Metaswitch FOF, Dkt. No. 356 at ¶ 38.  The evidentiary record indicates that Metaswitch has not been prejudiced in its attempts to obtain information regarding Genband's acquisition of assets from Tekelec and NextPoint.  As an initial matter, there is nothing in the evidentiary record that indicates that the timing of the filing of the lawsuit has somehow affected Metaswitch's ability to obtain this information.  Further, the evidentiary record indicates that Genband has fully complied with its discovery obligations regarding discovery of this information.  Dkt. No. 239 at 6-7.

## G.    Nortel and Genband's Involvement in CableLabs

### 1.    Agreements between CableLabs and NNCSI

**[FF73]**    Cable Televisions Laboratories, Inc. ("CableLabs") and Nortel Networks Cable Solutions, Inc. ("NNCSI") executed four documents relating to intellectual property rights:

1. A Contribution and License Agreement for Intellectual Property dated February 29, 2000.[2]  PX272, DX089.

2. A letter agreement dated February 29, 2000.  PX273.

3. A letter agreement dated Mach 2, 2000.  PX274.

4. A letter agreement dated January 23, 2006.  PX275.

**[FF74]**   NNCSI executed the CableLabs-NNCSI IPR Agreement on February 29, 2000, but CableLabs did not execute that agreement until March 3, 2000, after the parties exchanged the first two letter agreements.  PX272, DX089.

**[FF75]**   On February 29, 2000, NNCSI transmitted the CableLabs-NNCSI IPR Agreement with the first letter agreement.  PX273.  CableLabs's lawyer Dorothy Raymond executed the letter agreement with additional handwritten comments identified by her initials DR.  PX273.

**[FF76]**   Both parties later signed a revised letter agreement dated March 2, 2000. PX274.

**[FF77]**   On March 3, 2000, CableLabs executed the CableLabs-NNCSI IPR Agreement PX272, DX089.

**[FF78]**   Several years later, on January 23, 2006, CableLabs and NNCSI executed a third letter agreement confirming their understandings of the prior IPR agreements.  PX275.

---

[2] For its CableLabs license defense, Metaswitch relies on a Contribution and License Agreement for Intellectual Property executed by Nortel Networks Cable Solutions Inc. ("NNCSI") and CableLabs.  PX272.0001.  Although Genband signed a Contribution and License Agreement with CableLabs, before trial Metaswitch acknowledged that this Agreement would not entitle Metaswitch to a license because Genband did not own the patents that Metaswitch claims to be standards-essential at the time Genband signed the Agreement.  10.2.15 Pretrial Conf. Tr. at 32:8-36:13. The Court sustained Genband's objections to introducing the Genband-CableLabs Agreement (DX330), and it was not preadmitted or admitted into evidence at trial.  *See id.* at 40:3:11; Dkt. 463.

## 2. CableLabs IPR Agreement

### a) Section 1.b — "Affiliate"

**[FF79]**    Section 1.b of the CableLabs IPR Agreement defines "Affiliate" as including only subsidiary entities as opposed to parent entities.

**[FF80]**    Section 1.b states:

> "Affiliate" is an entity which directly or indirectly is controlled by another entity.  Control for purposes of this Agreement shall mean beneficial ownership of more than fifty percent of the voting stock or equity in an entity.

PX272 at 2; DX330 at 2.

**[FF81]**    As stated above, Affiliate is limited to an entity "controlled by another entity" and does not include an entity that controls another entity.  Thus, an "Affiliate" includes only subsidiary entities as opposed to parent entities.

### b) Section 1.e — "Licensed Claims" and the meaning of "Priority Date"

**[FF82]**    The CableLabs agreements define "Licensed Claims" as "the claims of all patents and patent applications, throughout the world that are entitled to an earliest priority date prior to December 31, 1999."  PX272 at 2; DX330 at 2.

**[FF83]**    In the definition of "Licensed Claims" in Section 1.e, the term "priority date" means the earliest filing dates to which a patent may claim priority.  *See, e.g.*, 37 C.F.R. § 1.451 (stating that a patent application receives a priority date of an earlier filed national or international application);  *What is Meant by Priority Date?*, WIPO, http://www.wipo.int/sme/en/faq/pat_faqs_q9.html (last visited April 27, 2015) ("[T]he filing date of that first application is considered the 'priority date.'");  *What is the Difference Between a Filing Date and a Priority Date?*, Bios, http://www.bios.net/daisy/patentlens/2343.html (last visited April 27, 2015) ("There are a number of situations where a patent application may claim

priority to an earlier application. These include: Continuation applications . . . Domestic applications based on foreign or international filings . . . [and] Patent filings based on US provisional patent applications . . . .").

### c) Section 1.h — "Licensed Technology" and the relationship between "Licensed Claims" and "License Know-how"

**[FF84]** Section 1.h defines "Licensed Technology" as "the copyrights, Licensed Claims, and Licensed Know-how included in any version of the Published Specification." PX272 at 2; DX330 at 2.

**[FF85]** To qualify as "Licensed Technology," claims of patents and patent applications must meet the definition of "Licensed Claims" in section 1.e. PX272 at 2; DX330 at 2.

### d) Section 4.a — Grant of License

**[FF86]** The patent license grant in section 4.a is limited to patents and patent applications that the Vendor-Author (or its current affiliates) owned when it executed the CableLabs IPR Agreement.

**[FF87]** Section 1.e defines "Licensed Claims" as limited to "claims of all patents and patent applications . . . as to which CableLabs or Vendor-Author or its current Affiliates, as the case may be, has the right to grant licenses . . . ." PX272 at 2; DX330 at 2.

**[FF88]** Section 4.a. states:

Grant of License. With respect to any Licensed Technology owned by Vendor-Author or CableLabs (or as to which CableLabs or Vendor-Author or its current Affiliates, as the case may be, has the right to grant licenses of the scope granted herein) that is incorporated into any version of a Published Specification, Vendor-Author and CableLabs grant to each other and to each other Participant, and to all of their Affiliates, subject to the terms and conditions of this Agreement, a nonexclusive, fully-paid, royalty-free, non- transferable, non-sublicensable (except for a limited right to sublicense end-users to use the interface portions of Licensed Products, subject to the limitations set forth herein, and as provided for in Section 4(b)), worldwide, perpetual license under its Licensed Claims, along with all Licensed Know-how included in any version of the Published Specification (subject to the right to withdraw under Section 6(b)), to make, have

made, use, reproduce, market, import, offer to sell and sell, and to otherwise distribute the interface portions of Licensed Products, provided that such license shall not extend to features of a product which are not required to comply with the Specification. In the event this license is terminated, end-user licenses in effect at the time of such termination shall remain in full force.

PX272 at 3-4; DX330 at 3-4.

**[FF89]**    Section 4.a does not encompass patents and patent applications acquired or obtained after execution of the agreement.

**[FF90]**    Other parts of section 4 address the licensing of rights acquired or obtained after execution of the agreement. For example, section 4.c is entitled "Grant of Future-Acquired Rights," and section 4.d is entitled to "Rights to Newly Developed IPR."

### 3.    Metaswitch's "alter ego" theory

#### a)    Metaswitch cannot use the alter ego doctrine to rewrite the terms of a written contract.

**[FF91]**    The alter ego doctrine is used to pierce the corporate veil to hold the owner of a corporation liable for some underlying judgment against the corporation. Indeed, in the *Port Chester Electrical Construction Corp. v. Atlas* case cited by Metaswitch, an electrical subcontractor was trying to pierce the corporate veils to collect a judgment. 40 N.Y.2d 652, 653-655 (N.Y. 1976).

**[FF92]**    If Metaswitch were applying the alter ego doctrine, then Metaswitch would be arguing that the court should disregard the corporate form of NNCSI so that Metaswitch can reach its parent Nortel Network, Inc. in order to satisfy some judgment against NNCSI. That is not what Metaswitch is attempting to do. Metaswitch has no liability claim against NNCSI. Metaswitch is not seeking reach to the parent Nortel Network, Inc. to satisfy some judgment against NNCSI.

**[FF93]**    Metaswitch is improperly trying to use the alter ego doctrine to rewrite the terms of a written contract, the CableLabs-NNCSI IPR Agreement.

**[FF94]**    Metaswitch contends it is entitled to a royalty-free license based on that agreement, but Metaswitch's problem is that the license grants are limited to patents owned by NNCSI or its subsidiaries, and the asserted patents were not owned by NNCSI or its subsidiaries. *See* [FF87]–[FF88].

**[FF95]**    The asserted patents were owned by parent corporate entities, including Nortel Networks, Inc., but the CableLabs-NNCSI IPR agreement did not require NNCSI to license patents owned by these parent Nortel entities. *See* [FF87]–[FF88].

**[FF96]**    Metaswitch is trying to use what it describes as an "alter ego" theory to rewrite the contract with CableLabs so that it can treat the agreement ***as if*** it were signed by the overall parent organization, Nortel Networks, Inc., as opposed to the particular corporate entity NNCSI. Metaswitch FOF, Dkt. No. 356 at ¶ 187 ("Because NNCS was an alter ego, its signature to the Contribution and License Agreement for Intellectual Property triggered duties on behalf of Nortel Networks.").

**[FF97]**    Alter ego theories cannot serve to modify the terms of a written agreement or contract. *See Keiler v. Harlequin Enterprises Limited*, 751 F.3d 64 (2nd Cir. 2014). *Keiler* involved a dispute over the terms of a publishing agreement. Several authors brought a class action lawsuit arguing that a publisher had breached a publishing agreement by underpaying them for digital versions of their books. The amount that was due the authors depended on which Harlequin entity was the "Publisher" under the agreement. There was a parent company organized in Canada and two subsidiaries, one Dutch and one Swiss. The authors asserted that, because the Canadian parent performed most publication duties and controlled the negotiation

and administration of the contracts, the Canadian parent should be treated as the "Publisher." The written agreement, however, made clear that the European subsidiaries were the Publisher. Applying New York law,[3] the court recognized that the best evidence of what parties to a written agreement intend is what they say. *Keiler*, 751 F.3d at 68. "Consequently, a written agreement that is complete, clear, and unambiguous must be unforced according to its terms." *Id.* at 69. Further the court held, "New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence and that industry practice may not be used to vary the terms of such a contract." *Id.* at 69. The court refused to treat the Canadian parent company as the publisher, because that would have "require[d] redrafting significant provisions of the contract wile informing other express ones." *Id.* at 69-70.

[**FF98**]    The Court rejected the argument that Metaswitch is making in this case, namely that alter ego theories can serve to modify the terms of written agreement. The Court held that the theory of alter ego is a theory of vicarious liability and cannot displace the express terms of an agreement:

> Moreover, as the district court observed, plaintiffs' theories of agency, assignment, and alter ego are not, strictly speaking, theories of contract interpretation, but rather theories of vicarious liability. Such theories, however, cannot displace the express terms of the Publishing Agreement. Consequently, we hold that the first three claims were properly dismissed.

*Id.* at 70; *see also H. Fox & Co. v. Blumenfeld*, 24 A.D.3d 722, 722, 809 N.Y.S.2d 87, 88 (2005) ("When the language of a contract is unambiguous, a court will enforce its plain meaning rather than rewrite the agreement, and its meaning may be determined as a matter of law on the basis of the writing alone without resort to extrinsic evidence").

[**FF99**]    Thus, Metaswitch cannot use any alter ego theory to rewrite the CableLabs IPR Agreement.

---

[3] That choice of law is significant because New York law also applies to the CableLabs agreement at issue in this case. PX272 at 7 ("This Agreement shall be governed by and interpreted in accordance with laws of the State of New York, excluding its choice of law rules.").

**b)** **Metaswitch cannot show any fraud or similar injustice sufficient to pierce the corporate veil as Metaswitch proposes.**

1.        Even if the alter ego theory could be used to rewrite the CableLabs-NNCSI IPR Agreement, Metaswitch presented no evidence at trial that the parent patent-owner Nortel Networks Limited committed fraud or wrongdoing. The IPR Agreement between CableLabs and NNCSI is a mutual, enforceable agreement negotiated by two sophisticated parties.

> **(1) CableLabs fully understood that Nortel Networks Limited was not the signatory to the Agreement and the signatory was NNCSI.**

2.        As evidenced by the Agreement itself, as well as the letter agreements, CableLabs fully understood that Nortel Networks Limited was not the signatory to the Agreement and that the signatory (NNCSI) did not own a patent portfolio. PX272.0001; PX274.0001; PX275.0002.

3.        The Agreement contains fair and mutual consideration, i.e., Nortel Networks Limited gave up the right to have its products licensed in exchange for avoiding having the claims of its patents automatically licensed to others. (1/12/2016 A.M. Trial Tr., Dkt. No. 469, at 80:5-13, 119:8-14.) In fact, CableLabs *benefited* from NNCSI's participation by, among other things, having the helpful input of its engineers in the standards-making process; that is why it was willing to enter into the deal. (1/12/2016 A.M. Trial Tr., Dkt. No. 469, at 60:3-11, 114:8-15.)

4.        At trial, the CableLabs representative Glenn Russell testified that there was no fraud:

> Q.  CableLabs is not here today to try and say that there's some fraud or that this agreement somehow was negotiated in bad faith, are they?
> A.  No.
> Q.  CableLabs went into this agreement with its eyes fully wide open, right, sir?
> A.  Correct.
> Q.   And, in fact, after doing so, CableLabs published on its website the legal entity with whom it entered this agreement, correct, sir?
> A.  You mean that list that was shown earlier of the -- yes.

Q.   Yes, sir. And so the fact of which entity had signed this agreement was now made public to all the other IPR vendors as well as the whole word, correct, sir?
A.   Correct.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 55:23-56:14.)

5.      Mr. Russell testified that other entities could do this same thing (i.e., use subsidiary entities to sign the IPR agreement):

Q.    Now, if any other company signing up wanted to do this same thing, CableLabs would have let them, right?
A.   Yes.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 56:15-17.)

6.      In fact, other companies, including Texas Instruments, did the same thing (i.e., use subsidiary entities to sign the IPR agreement):

Q.   (By Mr. Pankratz) We're looking at PX-166, Page 9.
        MR. PANKRATZ:  Scroll down to Texas Instruments.
Q.    (By Mr. Pankratz) You see Texas Instruments Israel Cable Broadband Communications, Limited, is a signatory to the IPR agreement, correct, sir?
A.   They were, yes.
Q.   They were.  But that is not the parent entity for Texas Instruments, is it, sir?
A.   I don't know Texas Instruments only because I did not work with them in -- they -- well, there are a number of companies that signed the IPR agreement.  I didn't work with them, and I don't know their structure.
Q.     You would expect that Texas Instruments Israel Cable Broadband Communications, Limited, is not the corporate parent of Texas Instruments, though, sir?
A.   I would assume that, yes.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 56:22-57:12;  PX166.)

### (2)     NNCSI notified CableLabs that NNCSI did not own any intellectual property.

7.      Contrary to Metaswitch's allegations of fraud, NNCSI notified CableLabs that NNCSI did not own any intellectual property and agreed to comply with the withdraw-or-otherwise-license provisions of the agreement with respect to only that limited category of

intellectual property that was contained in submissions by NNCSI employees. (1/14/2016 A.M.

Trial Tr., Dkt. No. 543, at 54:6-56:17.)

8.      In the February 29, 2000 letter agreement, NNCSI and CableLabs stated:

CableLabs also understands that NNCSI owns no Intellectual Property other than those rights necessary to comply with the Agreement with regards to submissions to CableLabs by NNCSI employees.

PX273.

9.      In the March 2, 2000 letter agreement, NNCSI and CableLabs stated:

CableLabs also understands that NNCSI owns no Intellectual Property other that those rights necessary to comply with the Agreement with regards to submissions to CableLabs by NNCSI employees. To the extent that a submission made by an NNCSI employee contains intellectual property owned by Nortel Networks, Inc., NNCSI warrants that it will obtain the necessary rights from Nortel Networks, Inc. to comply with the terms of the Agreement.

PX274.

10.      On January 23, 2006, the parties re-confirmed their shared understanding, including the following key points:

1.      It is reconfirmed that NNCSI is the sole Nortel entity that has participated or will participate as a Vendor-Author in the PacketCable project pursuant to the IPR Agreement. As acknowledges in the Jensen Letter, NNCSI has no intellectual property rights other that those rights necessary to comply with the IPR Agreement regarding submissions to CableLabs by NNCSI employees. To the extent that a submission made by NNCSI contains intellectual property rights owned by Nortel Networks, Inc., NNCSI warranted and continues to warrant that it will obtain the necessary rights from Nortel Networks, Inc. to comply with the terms of the IPR Agreement. However, for the avoidance of any doubt, there is no duty on NNCSI to notify of the withdrawal of intellectual property rights other than its own or those of Nortel Networks, Inc. contained in submissions made by NNCSI under sections 4 and 6(b) of the IPR Agreement. In other words, the failure of NNCSI to withdraw the intellectual property rights of Nortel Networks, Inc. or any other Nortel entity other than NNCSI does not create any license grants to such intellectual property rights, either express or implied, under the IPR Agreement.

PX275.

**(3)     Nortel employees participated as NNCSI.**

11.     Consistent with the CableLabs-NNCSI agreements, Nortel employees participated as NNCSI at meetings of CableLabs.  PX271 at 2 ("Nortel participates as Nortel Networks Cable Solutions Inc. to avoid IPR issues"); PX271 at 5 ("Everyone participates as Nortel Network Cable Solutions Inc.").

12.     At trial, the CableLabs representative, Glenn Russell, testified that he knew Courtland Wolfe was associated with NNCSI:

> Q.  Do you recall testifying at your deposition that you knew, for example, that people like Cortland were associated with Nortel Networks Cable Solutions?
> A.  Yes.
> Q.  And that was accurate testimony, correct, sir?
> A.  Yes.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 60:15-20.)

**4.     Metaswitch's knowledge**

**a)     Metaswitch knew or should have known that NNCSI was the only Nortel entity that signed the CableLabs IPR Agreement.**

**[FF100]**  At trial, the CableLabs representative, Glenn Russell, testified that the CableLabs website published the signatories to the CableLabs IPR Agreement and made them known to the whole world:

> Q.  CableLabs is not here today to try and say that there's some fraud or that this agreement somehow was negotiated in bad faith, are they?
> A.  No.
> Q.  CableLabs went into this agreement with its eyes fully wide open, right, sir?
> A.  Correct.
> Q.  And, in fact, after doing so, CableLabs published on its website the legal entity with whom it entered this agreement, correct, sir?
> A.  You mean that list that was shown earlier of the -- yes.
> Q.  Yes, sir. And so the fact of which entity had signed this agreement was now made public to all the other IPR vendors as well as the whole world, correct, sir?
> A.  Correct.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 55:23-56:14.)

**[FF101]**  Metaswitch signed the CableLabs IPR agreement in January 2007.  DX590.  A few months earlier in October 2006, the CableLabs website identified NNCSI as the only Nortel entity that had signed the IPR Agreement.[4]  In July 2008 (about six months after Metaswitch signed the IPR agreement), an updated list of signatories identifies Metaswitch.[5]  That list still identified NNCSI as the only Nortel entity that had signed the IPR Agreement.  *Id.*

**[FF102]**  Metaswitch's Mark Stewart admitted at trial that he could have looked up on CableLab's website to find out that NNCSI signed the CableLabs IPR Agreement:

> Q.   But you knew there were many different legal entities in the Nortel corporate structure, correct?
> A.   I -- I knew there were at least -- at least more than one, yes.
> Q.   If you wanted to know which corporate entity had signed the intellectual property rights agreement with PacketCable, you could have gone and looked on the public website, correct, sir?
> A.   I could have, yes.

(1/14/2016 A.M. Trial Tr., Dkt. No. 543, at 23:8-16.)

**[FF103]**  Metaswitch's production includes a list of signatories to the CableLabs IPR agreement, and that list identified NNCSI as the only Nortel entity that had signed the IPR Agreement.  PX166 at 7; DX589 at 7.

**[FF104]**  Metaswitch provides no evidence from which it was reasonable for Metaswitch to conclude that any Nortel entities other than NNCSI signed the CableLabs IPR Agreement.  Metaswitch FOF, Dkt. No. 356 ¶ 63.

> **b)**      **Metaswitch knew or should have known that the CableLabs IPR Agreement imposed obligations to license patents on signatories and their subsidiaries but not on any parent entities.**

**[FF105]**  Because Metaswitch signed the same CableLabs IPR Agreement, it should have been familiar with the terms of the agreement.  *See* DX590.  Thus, Metaswitch knew or

---

[4] https://web.archive.org/web/20061018074420/http://www.packetcable.com/howto/whosigned.html. PX1016.
[5] https://web.archive.org/web/20080708184959/http://www.packetcable.com/howto/whosigned.html.  PX1017.

should have known that "Licensed Claims" were limited to those claims of patents or patent applications owned by the signatory or its subsidiaries but did not extend to claims of patents and patent applications owned by the signatory's parent entities. *See id.* at ¶ 1.e.

## H.  IETF

**[FF106]**  At the jury trial, Metaswitch contended that it was entitled to a license to the asserted claims of the '561,'279, and '589 Patents based on an IETF Statement on Patent Licensing, which Nortel Networks Limited signed in May 2000 ("IETF Statement"). DX417.001-002; 1.11.16 P.M. Tr. at 9:17-10:5.

13.  The IETF Statement provides in relevant part:

> This letter affirms Nortel Networks Limited (Nortel Networks) position with respect to patents that are necessary to IETF standards or specifications. Individuals employed by Nortel Networks are involved in various working groups of the IETF. As a backdrop to any and all such activities, and in accordance with RFC 2026, Nortel Networks provides the following general statement:

> Nortel Networks may seek patent rights on technology described in a document which Nortel Networks contributes for use in IETF standards discussions or standards track specifications. If such patented technology is essential for the implementation, use, and distribution, of an IETF standard, Nortel Networks is willing to make available nonexclusive licenses on fair, reasonable, and non-discriminatory terms and conditions, to such patent rights it owns, solely to the extent such technology is essential to comply with such IETF standard.

DX417.001-002.

**[FF107]**  To show that the IETF Statement entitles Metaswitch to a license to a patent claim on FRAND terms, Metaswitch must show that:

(1)  Nortel Networks Limited contributed a document for use in IETF standards discussion or standards track specifications describing technology for which Nortel had or later obtained patent rights;

(2)     the relevant patent claim "is essential for the implementation, use, and distribution of an IETF standard;" and

(3)     Metaswitch's accused products comply with the IETF standard.

DX417.001-002.

**[FF108]** For three independent reasons, Metaswitch's IETF license defense fails. First, Metaswitch failed to show that the asserted claims are essential to an IETF standard. Second, there is no evidence that Nortel contributed to IETF a document describing the patented technology. Third, Metaswitch failed to show that any of its products comply with the relevant IETF standards.

> **1.    Metaswitch does not have a license to any asserted claim under the IETF Statement because it failed to show that the asserted claims are essential to an IETF standard.**

**[FF109]** The first problem with Metaswitch's defense is that it is cannot show that Genband's asserted claims are "essential for the implementation, use, and distribution of an IETF standard." *See* DX417.002.

> **a)    '561 Patent, Claims 6, 17, and 20**

**[FF110]** Metaswitch failed to show that Claims 6, 17, and 20 of the '561 Patent are "essential for the implementation, use, and distribution of an IETF standard" because the IETF document on which Metaswitch relied is not an "IETF standard" as required by the IETF Statement on Patent Licensing.

**[FF111]** Metaswitch relied on an IETF document, called IETF-draft-ietf-sip-privacy (DX705). 1.11.16 P.M. Tr. at 9:20-23. That document is an Internet Draft that expired in 2002. DX705.001 (stating that "[t]his document is an Internet-Draft" and expires August 31, 2002).

**[FF112]** Mark Stewart, Metaswitch's corporate representative on standards, repeatedly confirmed that IETF-draft-ietf-sip-privacy is not a standard. (1/14/2016 A.M. Trial Tr., Dkt. No.

543 at 17:5-8) ("Q. DX705 states: Status of this memo. This document is an Internet draft. Do you see that? A. Yes, I do."); (*id.* at 19:5-8) ("Q. (By Mr. Pankratz) I believe you also confirmed, sir, that you know that this Internet draft [DX705] is not an IETF standard, correct? A. That is correct.").

**[FF113]** Metaswitch's technical expert Dr. Williams also did not claim that IETF-draft-ietf-sip-privacy was a standard. (1/14/2016 A.M. Trial Tr., Dkt. No. 543 at 128:15-17) ("Q. (By Mr. Kubehl) You're not claiming that [DX705] is a standard, are you, sir? A. No, I am not."); (*id.* at 132:13-17) ("A. Which IETF standards are you referring to? Q. The ones you analyzed in your report, the one you talked about here today. A. The one I presented to the jury, as we just discussed, is not a standard; it's a document prepared by the IETF.").

**[FF114]** Genband's technical expert Mr. Lanning explained that the '561 Patent was not essential to the IETF Internet Draft identified by Metaswitch (DX-705) because this IETF reference is merely a draft document, not a standard. (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 211:23-212:2) ("Q. And finally . . . Defendants' Exhibit 705, does that establish patent essentiality with respect to the '561 patent? A. No As -- as the name implies, and you can see, this is just a working draft, it's not a standard.").

**[FF115]** In short, Metaswitch's and Genband's witnesses agreed that the IETF document on which Metaswitch relied—a draft, expired Internet draft—is not an IETF standard. Because the document is not a standard, Nortel Networks Limited is not required to grant a license to Metaswitch under the terms of the IETF Statement.

### b) '279 Patent, Claim 25 and '589 Patent, Claim 15

**[FF116]** Metaswitch also failed to show that the asserted claims of the '279 and '589 Patents are "essential for the implementation, use, and distribution of an IETF standard" because the IETF document on which Metaswitch relied is again not an "IETF standard."

**[FF117]**  Metaswitch relied on an IETF document called IETF RFC 3725 (DX676). (1/11/2016 P.M. Trial Tr., Dkt. No. 468 at 10:4-5.)  This document is entitled "Best Current Practices for Third Party Call Control (3pcc) in the Session Initiation Protocol (SIP)." DX676.001.  It is not a standard; rather, it simply "specifies an Internet Best Practices for the Internet Community, and requests discussion and suggestions for improvements."  DX676.001.

**[FF118]**  Mr. Stewart, Metaswitch's corporate representative on standards, testified that this document is not an IETF standard. (1/14/2016 A.M. Trial Tr., Dkt. No. 543 at 19:9-14) ("Q. Sir, DX6 -- 676 was a best current practices document . . . .  You understand, sir, that a best current practices is not an IETF standard, correct, sir? A. That is correct.").

**[FF119]**  Genband's technical expert Mr. Lanning testified to the same effect. (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 209:23-24) ("[T]he document RFC 3725 is not even a standard.").  Mr. Lanning testified that RFC 3725 (DX-676) is not a technical standard of the IETF, but merely a "best current practice" document.  (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 210:6-15.)  Mr. Lanning also explained that the "click-to-dial" feature is not a required in RFC 3725 because it does not use mandatory language like "must" or "required" as is the convention in the IETF.  (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 210:16-211:8.)

**[FF120]**  Thus, again, because the document on which Metaswitch relied is not a standard, Metaswitch does not have a license to any asserted claims of the '279 and '589 Patents under the IETF Statement.

> **2.**  **Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that Nortel contributed a document to the IETF describing the patented technology.**

**[FF121]**  Metaswitch's IETF license argument also fails for a second, independent reason: Metaswitch failed to present evidence that Nortel Networks Limited contributed to IETF a document describing the patented technology.

**[FF122]**　The obligation in the IETF Statement extends only to "technology described in *a document* which *[Nortel Networks Limited] contributes* for use in IETF standards discussions or standards track specifications" describing technology for which Nortel had or later obtained patent rights. DX417.002 (emphasis added). The license grant is tightly linked to Nortel Networks Limited's contribution to the standard.

**[FF123]**　Yet Metaswitch did not introduce any document that Nortel contributed and did not offer witness testimony about any such document. Without evidence that Nortel Networks Limited contributed to the IETF standard a document describing the patented technology, Metaswitch cannot show that it has a license to the asserted claims under the IETF Statement. Thus, Metaswitch does not have a license to any asserted claims of the '279 and '589 Patents under the IETF Statement.

### 3.　Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that its accused products comply with an IETF standard.

**[FF124]**　Metaswitch cannot show it has a license to any asserted claim under the IETF Statement for a third, independent reason: Metaswitch failed to show that its infringing products comply with the standard. At the jury trial, Metaswitch contended that it was entitled to a license to the asserted claims of the '561, '279, and '589 Patents based on an IETF Statement on Patent Licensing, which Nortel Networks Limited signed in May 2000 ("IETF Statement"). DX417.001-002; (1/11/2016 P.M. Trial Tr., Dkt. No. 468 at 9:17-10:5).

**[FF125]**　The IETF Statement provides in relevant part:

This letter affirms Nortel Networks Limited (Nortel Networks) position with respect to patents that are necessary to IETF standards or specifications. Individuals employed by Nortel Networks are involved in various working groups of the IETF. As a backdrop to any and all such activities, and in accordance with RFC 2026, Nortel Networks provides the following general statement:

Nortel Networks may seek patent rights on technology described in a document which Nortel Networks contributes for use in IETF standards discussions or standards track specifications. If such patented technology is essential for the implementation, use, and distribution, of an IETF standard, Nortel Networks is willing to make available nonexclusive licenses on fair, reasonable, and non-discriminatory terms and conditions, to such patent rights it owns, solely to the extent such technology is essential to comply with such IETF standard.

DX417.001-002.

**[FF126]**  To show that the IETF Statement entitles Metaswitch to a license to a patent claim on FRAND terms, Metaswitch must show that:

(1)     Nortel Networks Limited contributed a document for use in IETF standards discussion or standards track specifications describing technology for which Nortel had or later obtained patent rights;

(2)     the relevant patent claim "is essential for the implementation, use, and distribution of an IETF standard;" and

(3)     Metaswitch's accused products comply with the IETF standard.

DX417.001-002.

**[FF127]**  For three independent reasons, Metaswitch's IETF license defense fails.  First, Metaswitch failed to show that the asserted claims are essential to an IETF standard.  Second, there is no evidence that Nortel contributed to IETF a document describing the patented technology.  Third, Metaswitch failed to show that any of its products comply with the relevant IETF standards.

**4.     Metaswitch does not have a license to any asserted claim under the IETF Statement because it failed to show that the asserted claims are essential to an IETF standard.**

**[FF128]**  The first fatal problem with Metaswitch's defense is that it cannot show that Genband's asserted claims are "essential for the implementation, use, and distribution of an IETF standard."  DX417.002.

### a) '561 Patent, Claims 6, 17, and 20

**[FF129]** Metaswitch failed to show that Claims 6, 17, and 20 of the '561 Patent are "essential for the implementation, use, and distribution of an IETF standard" because the IETF document on which Metaswitch relied is not an "IETF standard" as required by the IETF Statement on Patent Licensing.

**[FF130]** Metaswitch relied on an IETF document, called IETF-draft-ietf-sip-privacy (DX705). (1/11/2016 P.M. Trial Tr., Dkt. No. 468 at 9:20-23.) That document is an Internet Draft that expired in 2002. DX705.001 (stating that "[t]his document is an Internet-Draft" and expires August 31, 2002).

**[FF131]** Mark Stewart, Metaswitch's corporate representative on standards, repeatedly confirmed that IETF-draft-ietf-sip-privacy is not a standard. (1/14/2016 A.M. Trial Tr., Dkt. No. 543 at 17:5-8) ("Q. DX705 states: Status of this memo. This document is an Internet draft. Do you see that? A. Yes, I do."); *id.* at 19:5-8 ("Q. (By Mr. Pankratz) I believe you also confirmed, sir, that you know that this Internet draft [DX705] is not an IETF standard, correct? A. That is correct.").

**[FF132]** Metaswitch's technical expert Dr. Williams also did not claim that IETF-draft-ietf-sip-privacy was a standard. (1/14/2016 A.M. Trial Tr., Dkt. No. 543 at 128:15-17) ("Q. (By Mr. Kubehl) You're not claiming that [DX705] is a standard, are you, sir? A. No, I am not."); *id.* at 132:13-17 ("A. Which IETF standards are you referring to? Q. The ones you analyzed in your report, the one you talked about here today. A. The one I presented to the jury, as we just discussed, is not a standard; it's a document prepared by the IETF.").

**[FF133]** Genband's technical expert Mr. Lanning explained that the '561 Patent was not essential to the IETF Internet Draft identified by Metaswitch (DX-705) because this IETF reference is merely a draft document, not a standard. (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at

211:23-212:2) ("Q. And finally . . . Defendants' Exhibit 705, does that establish patent essentiality with respect to the '561 patent? A. No As -- as the name implies, and you can see, this is just a working draft, it's not a standard.").

[**FF134**] In short, Metaswitch's and Genband's witnesses agreed that the IETF document on which Metaswitch relied—a draft, expired Internet Draft—is not an IETF standard. Since the document is not a standard, Nortel Networks Limited is not required to grant a license to Metaswitch under the terms of the IETF Statement.

### b) '279 Patent, Claim 25 and '589 Patent, Claim 15

[**FF135**] Metaswitch also failed to show that the asserted claims of the '279 and '589 Patents are "essential for the implementation, use, and distribution of an IETF standard" because the IETF document on which Metaswitch relied is again not an "IETF standard."

[**FF136**] Metaswitch relied on an IETF document called IETF RFC 3725 (DX676). 1.11.16 P.M. Tr. at 10:4-5. This document is entitled "Best Current Practices for Third Party Call Control (3pcc) in the Session Initiation Protocol (SIP)." DX676.001. It is not a standard; rather, it simply "specifies an Internet Best Practices for the Internet Community, and requests discussion and suggestions for improvements." DX676.001.

[**FF137**] Mr. Stewart, Metaswitch's corporate representative on standards, testified that this document is not an IETF standard. 1.14.16 A.M. Tr. 19:9-14 ("Q. Sir, DX6 -- 676 was a best current practices document. . . . You understand, sir, that a best current practices is not an IETF standard, correct, sir? A. That is correct.").

[**FF138**] Genband's technical expert Mr. Lanning testified to the same effect. 1.14.16 P.M. Tr. at 209:23-24 ("[T]he document RFC 3725 is not even a standard."). Mr. Lanning testified that RFC 3725 (DX-676) is not a technical standard of the IETF, but merely a "best current practice" document. 1.14.16 PM Trial Tr. at 210:6-15. Mr. Lanning also explained that

- 45 -

the "click-to-dial" feature is not a required in RFC 3725 because it does not use mandatory language like "must" or "required" as is the convention in the IETF.  1.14.16 PM Trial Tr. at 210:16-211:8.

**[FF139]**  Again, because the document on which Metaswitch relied  is not a standard, Metaswitch does not have a license to any asserted claims of the '279 and '589 Patents under the IETF Statement.

**[FF140]**  Furthermore, Metaswitch's alleged evidence of essentiality was not timely disclosed.  Before trial, Metaswitch represented that it would proceed on **only** Claim 1 of the '279 and '589 Patents.  9.25.15 Email from B. Mack, at 2; *see also* 1.10.16 Email from J. Baxter.  However, on the last day of trial, Metaswitch elicited previously undisclosed expert testimony from its technical expert Dr. Akl that **two different claims**, Claim 25 of the '279 Patent and Claim 15 of the '589 Patent, were essential to IETF RFC 3725 (DX676).  1.14.16 P.M. Tr. at 33:3-36:15.

**[FF141]**  Since Metaswitch did not timely disclose its expert's opinion on the essentiality of Claim 25 of the '279 Patent and Claim 15 of the '589 Patent, Metaswitch cannot use those expert opinions in its response to this motion.  Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) [including a report containing a complete statement of the expert witness's opinions], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. . . .  [T]he court . . . [also] may impose other appropriate sanctions . . . .").

**[FF142]**  Without these opinions, Metaswitch has no evidence that any claims of the '279 and '589 Patents are essential to any IETF document, including the one discussed above

which is not even an IETF standard.  Thus, for this additional, independent reason, Metaswitch's IETF license defense also fails as a matter of law for the '279 and '589 Patents.

5.   **Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that Nortel contributed a document to the IETF describing the patented technology.**

**[FF143]**  Metaswitch's IETF license argument also fails for a second, independent reason: Metaswitch failed to present evidence that Nortel Networks Limited contributed to IETF a document describing the patented technology.

**[FF144]**  The obligation in the IETF Statement extends only to "technology described in *a document which [Nortel Networks Limited] contributes* for use in IETF standards discussions or standards track specifications" describing technology for which Nortel had or later obtained patent rights.   DX417.002 (emphasis added).   The license grant is tightly linked to Nortel Networks Limited's contribution to the standard.

**[FF145]**  Yet Metaswitch did not introduce any document that Nortel contributed and did not offer witness testimony about any such document.   Without evidence that Nortel Networks Limited contributed a document describing the patented technology to the IETF standard, Metaswitch cannot show that it has a license to the asserted claims under the IETF Statement.   Accordingly, Metaswitch does not have a license to any asserted claims of the '279 and '589 Patents under the IETF Statement.

**6. Metaswitch does not have a license to any asserted claim under the IETF Statement because Metaswitch failed to show that its accused products comply with an IETF standard.**

**[FF146]**   Metaswitch cannot show it has a license to any asserted claim under the IETF Statement for a third, independent reason:  Metaswitch failed to show that its infringing products comply with the alleged IETF standards at issue.[6]

**[FF147]**   Metaswitch agrees that in order to be licensed under the IETF, its infringing products must practice the relevant IETF standard.  *See* Dkt. 451 at 36 (Metaswitch's Proposed IETF Instruction stating that as an element of Metaswitch's IETF license defense, Metaswitch must prove that "Metaswitch's accused products practice the [relevant] IETF standard").   But Metaswitch did not meet its burden of proof on this element.

### a)   '561 Patent, Claims 6, 17, and 20

**[FF148]**   Metaswitch did not present evidence that its products practice IETF draft-ietf-sip-privacy, the IETF document on which Metaswitch relies for its IETF license defense for the '561 Patent claims.

**[FF149]**   Metaswitch's corporate representative on standards, Mr. Stewart, said that he was not claiming that Metaswitch's products complied with IETF draft-ietf-sip-privacy.  1.14.16 A.M. at 18:8-12 ("Q.  . . .You're not claiming that any Metaswitch product complies with this Internet draft [IETF draft-ietf-sip-privacy], are you, sir?  A.  No.  I'm saying that we have some support within our products.").

**[FF150]**   Metaswitch's technical expert Dr. Williams similarly failed to testify at all that any Metaswitch product practiced IETF draft-ietf-sip-privacy.  1.14.16 A.M. Tr. at 107-108 (not discussing Metaswitch products in relation to IETF draft-ietf-sip-privacy).

---

[6] As discussed above, the IETF documents on which Metaswitch relies are not standards, but for purpose of this independent argument, the Court assumes that they are standards.

### b) '279 Patent, Claim 25 and '589 Patent, Claim 15

**[FF151]**   Metaswitch also did not present evidence that its products practice IETF RFC 3725, the IETF document on which Metaswitch relies for its IETF license defense as to the '279 and '589 Patent claims.

**[FF152]**   Mr. Stewart again failed to provide such testimony.  1.14.16. A.M. at 19:22-20:1 ("Q. You don't know one way or another whether Metaswitch complies with any mandatory portions set forth in the best current practices [IETF RFC 3725]?  A.  There are, to my knowledge, no mandatory portions within that document.").

**[FF153]**   Metaswitch technical expert Dr. Akl testified only that the Metaswitch's Click-to-Dial product was "very similar to what's in the [IETF RFC 3725] standard."  1.14.16 P.M. Tr. at 35:9-10; *see also id.* at 36:7-10 (same).   Similarity, however, does not establish that Metaswitch's products comply with IETF RFC 3725.

**[FF154]**   Without evidence that any particular Metaswitch product complies with IETF draft-ietf-sip-privacy or IETF RFC 3725, Metaswitch did not show that it has a license to the '561 Patent, the '279 Patent, or the '589 Patent under the IETF Statement.    the alleged IETF standards at issue.[7]

**[FF155]**   Metaswitch agrees that in order to be licensed under the IETF, its infringing products must practice the relevant IETF standard.  *See* Dkt. 451 at 36 (Metaswitch's Proposed IETF Instruction stating that as an element of Metaswitch's IETF license defense, Metaswitch must prove that "Metaswitch's accused products practice the [relevant] IETF standard").  However, Metaswitch did not meet its burden of proof on this element.

---

[7] As discussed above, the IETF documents on which Metaswitch relies are not standards, but for purpose of this independent argument, the Court assumes that they are standards.

### c) '561 Patent, Claims 6, 17, and 20

**[FF156]**  Metaswitch did not present evidence that its products practice IETF draft-ietf-sip-privacy, the IETF document on which Metaswitch relies for its IETF license defense for the '561 Patent claims.

**[FF157]**  Metaswitch's corporate representative on standards, Mr. Stewart, said that he was not claiming that Metaswitch's products complied with IETF draft-ietf-sip-privacy.  1.14.16 A.M. at 18:8-12 ("Q.  . . .You're not claiming that any Metaswitch product complies with this Internet draft [IETF draft-ietf-sip-privacy], are you, sir?  A.  No.  I'm saying that we have some support within our products.").

**[FF158]**  Metaswitch's technical expert Dr. Williams similarly failed to testify at all that any Metaswitch product practiced IETF draft-ietf-sip-privacy.  1.14.16 A.M. Tr. at 107-108 (not discussing Metaswitch products in relation to IETF draft-ietf-sip-privacy).

### d) '279 Patent, Claim 25 and '589 Patent, Claim 15

**[FF159]**  Metaswitch also did not present evidence that its products practice IETF RFC 3725, the IETF document on which Metaswitch relies for its IETF license defense as to the '279 and '589 Patent claims.

**[FF160]**  Mr. Stewart again failed to provide such testimony.  1.14.16. A.M. at 19:22-20:1 ("Q. You don't know one way or another whether Metaswitch complies with any mandatory portions set forth in the best current practices [IETF RFC 3725]?  A.  There are, to my knowledge, no mandatory portions within that document.").

**[FF161]**  Metaswitch technical expert Dr. Akl testified only that the Metaswitch's Click-to-Dial product was "very similar to what's in the [IETF RFC 3725] standard."  1.14.16 P.M. Tr. at 35:9-10; *see also id.* at 36:7-10 (same).   Similarity, however, does not establish that Metaswitch's products comply with IETF RFC 3725.

**[FF162]**  Without evidence that any particular Metaswitch product complies with IETF draft-ietf-sip-privacy or IETF RFC 3725, Metaswitch did not show that it has a license to the '561 Patent, the '279 Patent, or the '589 Patent under the IETF Statement.

## I.  ITU

**[FF163]**  At the jury trial, Metaswitch asserted that it is entitled to a license to Claim 70 of the '971 Patent because Claim 70 is essential to certain of the ITU Q.12xx Series Recommendations.[8]

**[FF164]**  For its ITU license defense, Metaswitch relies on two documents as evidence of an alleged Nortel licensing obligation: a General Patent Statement and Licensing Declaration signed by Nortel Networks Corporation in November 1999 (DX423), and a General Patent Statement and Licensing Declaration signed by Nortel Networks Limited in October 2007 (DX424) (collectively, "ITU Declarations").

**[FF165]**  To show that these ITU Declarations provide Metaswitch a license on FRAND terms to a particular asserted claim, Metaswitch must show that:

    (1)       part or all of any proposal contained in a contribution submitted by Nortel Networks Corp. was included in an ITU Recommendation;

    (2)       the included part contains the asserted claim;

    (3)       the asserted claim's use would be required to implement the ITU Recommendation;

    (4)       Metaswitch's accused products practice the same ITU standard or Recommendation; and

    (5)       Metaswitch committed to license any essential patents or essential patent claims of its own for implementation of the same ITU Recommendation under reasonable terms and conditions.

DX423.001; Ex. 5, DX424.003.

---

[8] The ITU Q.12xx Series Recommendations that Metaswitch relied on at trial are the Q.1204 Recommendation (DX460), the Q.1241 Recommendation (DX674), and the Q.1244 Recommendation (DX675).  1.14.16 P.M. Tr. at 18:25-19:2, 212:3-4.

**[FF166]**  For three independent reasons, Metaswitch's ITU license defense fails.  First, Metaswitch failed to show that Nortel made a contribution to ITU to trigger any possible license obligation.  Second, Metaswitch failed to show that its accused products comply with the relevant ITU Recommendations.  Third, Metaswitch did not present sufficient evidence to show that the asserted claims are essential to the ITU Recommendations.

      1.    **Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to show that Nortel contributed its patented technology to the relevant ITU Recommendations.**

**[FF167]**  The license grant in the ITU Declarations applies only if "part(s) or all of any proposal contained in contributions submitted by [Nortel Networks Corp. or Nortel Networks Limited] are included in ITU Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed . . . ."  DX423.001; *see also* DX424.003 (similar).  In other words, the Nortel entities are required to license claims on certain technology only if they submit a contribution, that contribution is included in the recommendation, and that contribution contains materials that are patented by Nortel Networks Corp. or Nortel Networks Limited.

**[FF168]**  Metaswitch failed to present any evidence that either Nortel entity made ***any*** technology contribution to the relevant ITU standards, let alone a contribution that included the patented technology.  Thus, Metaswitch cannot show that it has a license to Claim 70 of the '971 Patent under the ITU Declarations.

      2.    **Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to prove that its accused products comply with the relevant ITU Recommendations.**

**[FF169]**  Metaswitch also failed to prove that its accused products comply with the relevant ITU Recommendations.

**[FF170]**  The Declaration states that the patent holder will grant a license to "make, use and sell *implementations of the relevant ITU-T/ITU-R Recommendation*."  DX424.003 (emphasis added); *see also* Dkt. 451 at 38 (Metaswitch's Proposed ITU Instruction stating that as an element of Metaswitch's ITU license defense, Metaswitch must prove that "Metaswitch's accused products practice the same ITU standard or Recommendation").  Thus, any license would apply to only products that implement the relevant Recommendations.

**[FF171]**  Metaswitch presented no evidence that its accused products implement the relevant ITU Recommendations.  Metaswitch's corporate representative Mr. Stewart testified that Metaswitch's products supported the ITU Q.1204 Recommendation (DX460), but he admitted that he did not know whether Metaswitch's products complied with that standard.  (1/14/2016 A.M. Trial Tr., Dkt. No. 543 at 20:8-11) ("Q. So you don't know one way or the other whether Metaswitch complies with the Q.1204 recommendation, correct, sir?  A.  That is correct.").  Since there is no evidence that Metaswitch's accused products comply with the relevant ITU Recommendations, Metaswitch is not entitled to a license to Claim 70 of the '971 Patent under the ITU Declarations.

**3.      Metaswitch does not have a license to Claim 70 of the '971 Patent under the ITU Declarations because it failed to prove that the claim is essential to the relevant ITU Recommendations.**

**[FF172]**  A license obligation exists only if Claim 70 "would be required to implement the ITU-T Recommendation(s)."  DX423.001; *see* DX424.003 (similar).  Metaswitch failed to establish at trial that Claim 70 of the '971 Patent is essential to the relevant ITU Recommendations.

**[FF173]**  Metaswitch's technical expert Dr. Akl was asked whether Claim 70 of the '971 Patent is essential to the ITU intelligent networking standards, and his testimony was a single

conclusory statement, "It is also essential to that standard." 1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 18:17-22. This testimony, however, did not relate to any particular standard document.

**[FF174]** When Dr. Akl was asked about particular documents, he addressed ***only two*** pages—page 7 of the Q.1204 Recommendation (DX460) and page 54 of the ITU Q.1244 Recommendation (DX675). (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 20:19-24, 21:23-22:10.) And, as to those two pages, his testimony is insufficient because he simply concluded that the claimed subject matter may be described on those two pages—not that the ITU documents ***require*** implementation of those descriptions. (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 22:5-6) ("the functionality that is required in the claim is actually in this part of the standard, also.").

**[FF175]** Genband's expert Mr. Lanning testified that the '971 Patent was not essential to ITU Q.1241 Recommendation (DX674) or the ITU Q.1244 Recommendation (DX675). (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 212:3-213:2.) As Mr. Lanning explained, the '971 Patent could not be essential because neither standard included an SSF receiving a message over an IP network. (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 212:9-11.) Further, Mr. Lanning showed that the descriptions on which Dr. Akl relied were not standards requirements, citing as an example Section 4.2.5 of DX675 which states that the interface for the IP Multimedia control plane "may require standardization." (1/14/2016 P.M. Trial Tr., Dkt. No. 474 at 212:13-213:2) (describing section 4.2.5 in DX675.015).

## II.  CONCLUSIONS OF LAW ("CL")

The Court, having considered the parties' arguments and having made the foregoing findings of fact, proceeds to make the following conclusions of law:

### A. Permanent Injunction: Availability

**[CL1]**    Genband moves to alter or amend the Final Judgment to include a permanent injunction under Federal Rule of Civil Procedure 59(e). (Dkt. No. 491); *see* [FF20] Metaswitch opposes the motion. (Dkt. No. 502.) As the Court has previously vacated its entry of Final Judgment, the Court considers this as a motion for inclusion of permanent injunction in the Final Judgment. *See* [FF21]. For the reasons set forth herein, Genband's motion for a permanent injunction (Dkt. No. 491) is **DENIED**.

**[CL2]**    The Court also took under advisement Genband's objections to testimony Metaswitch submitted relating to the permanent injunction and equitable defenses: the declaration of Lance E. Gunderson (Dkt. No. 510), the declaration of Alastair Mitchell (Dkt. No. 511), and the declarations of Jennifer Kash (Dkt. No. 545). As the Court does not rely on any of the three objected-to declarations, the objections are hereby **DENIED AS MOOT**.

### 4.    Legal Standard

**[CL3]**    "The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (citing 35 U.S.C. § 154(a)(1)). A patentee can obtain a permanent injunction by showing: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391.

### 5.    Irreparable Harm

**[CL4]**    An injunction requires a causal nexus between the alleged irreparable harm and infringement. Where the patentee claims that it is irreparably harmed by competing against an

infringing product, it must "show that the infringing feature drives consumer demand for the accused product." *Apple Inc. v. Samsung Elecs.* ("*Apple II*"), 695 F.3d 1370, 1375 (Fed. Cir. 2012). The Court "should focus on the importance of the claimed invention in the context of the accused product and not just the importance, in general, of features of the same type as the claimed invention." *Apple Inc. v. Samsung Elecs*. ("*Apple III*"), 735 F.3d 1352, 1364 (Fed. Cir. 2013). Here, it is Genband's burden to demonstrate that the patented features drive demand for the product.

**[CL5]**   Genband argues that it does not have to show that the patented features are the sole or predominant reason why customers buy Metaswitch's infringing products.  Dkt. No. 512-1 at ¶ 410 (citing *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641–42 (Fed Cir. 2015) ("*Apple IV*").  Genband argues that it needs to show only "some connection" between the patented features and the demand for the infringing products.  *Id.*  Thus, Genband contends that causal nexus can be shown with evidence that a patented feature is one of several features that impact customers' decisions to buy the infringing products.  *Id.* (citing *Apple IV* at 642).  Genband argues that the Court can aggregate the patents for purpose of analyzing irreparable harm. *Id.* (citing *Apple III*, 735 F.3d at 1365).

**[CL6]**   During the bench trial, Genband presented the following regarding the causal nexus, which falls into three general categories: (1) a self-generated "win-loss" report; (2) demonstratives purporting to correlate dates of Metaswitch press releases with an alleged decline in Genband's market share; and (3) statements from Metaswitch marketing materials and opinion testimony from Mr. McCready.

**[CL7]**     Genband's presentation of evidence does not satisfy its burden to show causal nexus. Accordingly, Genband fails to show that it has suffered irreparable harm as required for a permanent injunction.

**[CL8]**     In a separate prong of analysis on the element of irreparable harm, laches may be a complete bar to an injunction. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, 807 F.3d 1311, 1331 (Fed. Cir. 2015) (*en banc*); *see also* Section II.B, *infra* (addressing the defense of laches). However, even if not amounting to laches, "delay in bringing an infringement action" is a factor "that could suggest that the patentee is not irreparably harmed by the infringement." *Apple I*, 678 F.3d at 1325–26.

**[CL9]**     Genband and Nortel delayed bringing suit after Metaswitch allegedly began infringing before asserting Genband's patents. Specifically, the Genband marketing department monitored Metaswitch press releases regarding new Metaswitch products, and would conduct competitive analyses that involved comparing Genband products to Metaswitch products. *See* [FF30]. Furthermore, Metaswitch's accused products and features were publicly announced and described in marking documents at least six years prior to the Complaint, placing Genband on at least constructive, if not actual, notice. *See* [FF33]–[FF35]; *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1339 (Fed. Cir. 1998).

**[CL10]**   Genband analyzed Metaswitch's products dating back to 2007. *See* [FF35]–[FF36]. Despite this knowledge, Genband did not notify Metaswitch of any infringement until 2014, when it filed this case, and even then it did not seek a preliminary injunction.

**[CL11]**   Accordingly, the Court finds that Genband and Nortel's delay in bringing an infringement action against Metaswitch is indicative that the patentee is not irreparably harmed by the infringement.

**[CL12]**　　The Court finds that Genband has failed to show the required irreparable harm element for the two reasons discussed above. Genband's motion for permanent injunction is **DENIED**. The Court need not and does not reach the remaining elements of permanent injunction analysis: adequate compensation, balance of hardships, public interest, and scope.

## B.　　Defense of Laches

### 1.　　Legal Standard

**[CL13]**　　"Laches is cognizable under 35 U.S.C. § 282 (1988) as an equitable defense to a claim for patent infringement." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).

**[CL14]**　　A successful laches defense bars recovery of infringement damages that occurred prior to the filing of the suit. *Aukerman*, 960 F.2d at 1040–41.

**[CL15]**　　Laches can also bar injunctive relief. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311, 1331 (Fed. Cir. 2015) (en banc). Here, having previously denied Genband's motion for permanent injunction, the Court does not address whether or not laches bars injunctive relief in this case. *See* [CL12]

**[CL16]**　　Two elements underlie the defense of laches: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay. The district court should consider these factors and all of the evidence and other circumstances to determine whether equity should intercede to bar pre-filing damages. *Id.* The alleged infringer must prove delay and prejudice by a preponderance of the evidence. *Id.* at 1045.

**[CL17]**　　"[T]he establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every

case. Laches remains an equitable judgment of the trial court in light of all the circumstances."

*A.C. Aukerman Co.*, 960 F.2d at 1036.

### e) Delay

**[CL18]**    If a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity, a rebuttable presumption arises that the delay was unreasonable and unjustified, and that material prejudice resulted. *Aukerman*, 960 F.2d at 1034–35. This presumption shifts the burden of proof to the patentee to come forward with evidence to prove that the delay was justified or that material prejudice did not result.  *Id.*  Such evidence "must be sufficient to put the existence of a presumed fact into genuine dispute." *Id.* at 1037.  If the patentee presents such evidence, then the burden of proving laches remains with the alleged infringer. *Id.* at 1037–38.

**[CL19]**    "Although our precedent is clear that the patentee's constructive knowledge of an infringer's behavior can suffice to start the laches clock, it is equally clear that the patentee must have actual or constructive knowledge of an act of infringement that gives rise to a legal claim before that clock begins to run against the patentee."  *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297–98 (Fed. Cir. 2004).

**[CL20]**    This does not necessarily mean that a patentee must police the market in which it competes in order to avoid a laches defense.  For a duty to police the market to exist, the infringement generally must be easily ascertainable from a simple visual inspection of the accused product or other materials.  In the absence of other evidence that would put a reasonable patentee on notice of infringement by a specific accused infringer, a duty to police will generally not exist where the infringement is not easily ascertainable from a simple visual inspection. *Wanless v. Fedders Corp.*, 145 F.3d 1461, 1465 and 1467 (Fed. Cir. 1998).

**[CL21]** "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Aukerman*, 960 F.2d at 1032.

**[CL22]** Facts and circumstances that can justify a delay can include, during the period of delay: (1) being involved in other litigation; (2) being involved in negotiations with the alleged infringer; (3) poverty or illness; (4) wartime conditions; (5) being involved in a dispute about ownership of the patent; or (6) minimal amounts of allegedly infringing activity by the alleged infringer. *Id.* at 1033.

### f) Prejudice

**[CL23]** Under the doctrine of laches, the prejudice may be economic or evidentiary. *Aukerman*, 960 F.2d at 1043.

### (1) Economic Prejudice

**[CL24]** Economic prejudice is determined by whether or not the alleged infringer changed its economic position in a significant way during the period of delay resulting in losses beyond merely paying for infringement and also whether the alleged infringer's losses as a result of that change in economic position likely would have been avoided if the patentee had filed this lawsuit sooner. *Aukerman*, 960 F.2d at 1033.

**[CL25]** The "loss" and "damages" do not include "those attributable to a finding of liability for infringement." *Id.* It is not economic prejudice to pay damages from infringing sales of products generating a profit over a longer period of time resulting from delay. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1376 (Fed. Cir. 2010).

**[CL26]** The accused infringer must establish a nexus between their alleged economic injury and the patentee's delay. *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1066 (Fed. Cir. 2003); *see ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) (alleged infringers had "to prove that their increased

expenditures, i.e., on marketing and development, were in [some] way related to actions taken by the patentee").

**[CL27]**   The Federal Circuit has also rejected accused infringers' arguments that they sustained prejudice because they spent substantial amounts of money to design, develop, and promote different accused products when they did not alter their conduct once the suit was filed. *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992); *see also i4i Ltd. Partnership v. Microsoft Corp.,* 2009 WL 2449024, *33 (E.D. Tex. 2009).

### (2) Evidentiary Prejudice

**[CL28]**   Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1033 (citations omitted).

**[CL29]**   An accused infringer cannot prove it suffered evidentiary prejudice by only offering general statements stating that witnesses have vanished or become inaccessible, or that documents have been lost or destroyed.  *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992).  Rather, an accused infringer must show "exactly what particular prejudice it suffered from the absence of these witnesses or evidence."  *Id.*

### 2.    Analysis

**[CL30]**   Based on the findings of fact and applicable legal standards discussed above, the Court finds that the doctrine of laches does not limit Genband's recover of damages.

**[CL31]**   Genband's filing of this lawsuit in January 2014 did not constitute an unreasonable delay.

**[CL32]**   To the extent that Genband delayed suit for six years or more, the Court finds that Genband has rebutted the presumption that such delay was unreasonable and that material

prejudice resulted. The Court finds that the minimal amount of Metaswitch's infringing activity, Nortel's bankruptcy, and Genband's negotiations with Metaswitch are sufficient to put the existence of any presumed delay into genuine dispute. *See* [FF28]–[FF49]. The burden of proving laches—specifically, prejudice—by a preponderance of the evidence remains with Metaswitch.

**[CL33]** Metaswitch has not proven, by a preponderance of the evidence, that it has been materially prejudiced by any alleged delay. There is no evidence that Metaswitch suffered any economic harm other than damages it would owe to Genband as a result of the allegedly infringing activity. The record consists only of conclusory allegations of economic prejudice. *See* [FF50]–[FF56].

**[CL34]** Similarly, Metaswitch has not established any evidentiary prejudice. Metaswitch has not detailed what specific evidence it was unable to obtain that it could have obtained had the lawsuit been filed earlier. Again, Metaswitch has only proffered conclusory statements of evidentiary prejudice, and these are insufficient. *See* [FF57]–[FF72].

### C. Equitable Defense: Implied Waiver

#### 1. Applicable Law

**[CL35]** Metaswitch bases its implied wavier defense on *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004 (Fed. Cir. 2008). Metaswitch states:

> Where an accused infringer proves by clear and convincing evidence that the patentee had a duty to inform a standard setting organization of its asserted patents based on the written policies of the standard setting organization, knew about its duty at the time the standard setting organization was adopting a particular industry standard, failed to meet that duty, and failed to inform the standard setting organization of the asserted patents, knowing that they reasonably might be necessary to practice the adopted standard, the patentee impliedly waives its right to enforce its patents against products practicing the resulting standard. *See Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019-22 (Fed. Cir. 2008).

Dkt. No. 356 (Metaswitch FOF) at ¶ 190.

**2.      The Court concludes that Metaswitch has not proven by clear and convincing evidence that implied waiver bars Genband's damages.**

**[CL36]**   Based on the findings of fact and applicable legal standards discussed above, the Court finds that the doctrine of implied waiver does not bar Genband's recovery of damages. Accordingly, Metaswitch's motion to impose a ban on Genband's recovery based upon the doctrine of implied waiver is **DENIED**.

**[CL37]**   Metaswitch does not point to any duty to disclose in the CableLabs IPR Agreement.   Metaswitch cited to the general agreement but failed to identify any particular provision or language establishing a duty for NNCSI to disclose.   For the reasons explained above, the Nortel defendant and Genband did not have an obligation to license the '279, '561, '589, and '971 Patents under the CableLabs IPR Agreement.   Thus, their conduct could not constitute an implied waiver.

**[CL38]**   Metaswitch has failed to show, by clear and convincing evidence, that Nortel breached a written policy of the IETF that required the disclosure of the asserted patents.   The policy Metaswitch relies upon was promulgated in 2005.   That policy applies to individual contributors to an IETF standard, and sets a "reasonably and personally known" standard for disclosure.   Metaswitch has failed to offer any evidence that a contributor employed by Nortel breached their obligation under the IETF's written policies.

**[CL39]**   Metaswitch has failed to show, by clear and convincing evidence, that Nortel breached a written policy of the ITU that required the disclosure of the asserted patents.   The written policy Metaswitch relies upon was promulgated in 2012.   The policy only requires a participant to disclose patents it knows are standards essential.   Moreover, the disclosure obligation only requires "good faith and on a best effort basis" with "no requirement for patent

searches." DX425. Metaswitch has failed to allege that any specific Nortel participant knew that the asserted patents were essential to an ITU standard, and that the duty to disclose was breached.

**D.    Equitable Defense: Equitable Estoppel**

**1.    Applicable Law**

**[CL40]**    The owner of a patent may forfeit its right to any relief from an infringer where: (1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130 (Fed. Cir. 2013) (citing *Aukerman*, 960 F.2d at 1028); *see also Winbond Electronics Corp. v. International Trade Com'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001), opinion corrected, 275 F.3d 1344 (Fed. Cir. 2001).

**[CL41]**    The alleged infringer must prove each of these elements by a preponderance of the evidence, but even if all these elements are proven, equitable estoppel need not be found if such a finding would be unfair in light of the conduct of the parties.  *Aukerman*, 960 F.2d at 1045-46.

**[CL42]**    To show reliance, the alleged infringer must demonstrate that, "in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action. . . . To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with building the [infringing product]." *Aukerman*, 960 F.2d at 1042-43.

**[CL43]**    No equitable estoppel can exist if the alleged infringer did not know of the patent during the time that the alleged infringer claims reliance.  *Winbond*, 262 F.3d at 1374-75; *Aukerman*, 960 F.2d at 1042 ("[F]or equitable estoppel the alleged infringer cannot be unaware . . . of the patentee and/or its patent.").

**[CL44]**    In the context of standard setting organizations, there is no equitable estoppel if there was not a duty to disclose the patent to the organization or if there was no breach of an existing duty to disclose the patent.  *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011).

**[CL45]**    Material prejudice may be economic or evidentiary.  *Aukerman*, 960 F.2d at 1043.  Economic prejudice "may be shown by a change of economic position flowing from actions taken or not taken by the patentee."  *Aspex Eyewear*, 605 F.3d at 1312-13 (citing *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) ("[C]ases in which economic prejudice has been found lacking did not so hold because of a lack of capital investments, but, rather, because the alleged infringer failed to prove that their increased expenditures, i.e., on marketing and development, were in any way related to actions taken by the patentee.")).  Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Aukerman*, 960 F.2d at 1033 (citations omitted).

**[CL46]**    The Court must consider all evidence relevant to the equities. *Radio Sys. Corp.*, 709 F.3d at 1310 (citing *Aukerman*, 960 F.2d at 1028).

### 2. The Court concludes that Metaswitch has not proven by clear and convincing evidence that equitable estoppel bars Genband's damages.

[CL47]   Based on the findings of fact and applicable legal standards discussed above, the Court finds that the doctrine of equitable estoppel does not bar Genband's recovery of damages, and Metaswitch's motion seeking to ban Genband's recovery on that basis is **DENIED**.

[CL48]   With respect to equitable estoppel, Metaswitch has not proved by a preponderance of the evidence that it substantially relied on any allegedly misleading conduct of Nortel or Genband in connection with taking some action.

[CL49]   Metaswitch bases its waiver defense on Nortel's involvement with CableLabs, IETF, and ITU.  As described above, Metaswitch is not entitled a license under any of the SSO agreements.

[CL50]   As discussed in the findings of fact, Metaswitch knew or should have known that Nortel had no obligation to license the asserted patent under the SSO agreements.  Similarly, Nortel's positions with respect to its licensing commitments to the IETF and ITU were publicly known and available to other participants, such as Metaswitch.

[CL51]   Moreover, Metaswitch failed to show that Nortel breached any duty to disclose the asserted patents.  Metaswitch points to no duty to disclose in the CableLabs IPR Agreement.  Also as described above, Metaswitch failed to show that Nortel breached a written policy of the IETF or ITU that required the disclosure of the asserted patents.

[CL52]   Furthermore, Metaswitch cannot show reliance because it did not even have knowledge of the asserted patents during the relevant time frames.  Metaswitch contends that it did not become aware of the '589, '561, and '971 Patent until the filing of this lawsuit.

Metaswitch's June 22, 2015 Supplemental Responses and Objections to Genband's Interrogatories Nos. 5 and 12 at 12. For this reason alone, equitable estoppel does not apply.

[CL53] Metaswitch alleges that it first became aware of the '279 Patent in or around January 2008. Supplemental Responses and Objections to Genband's Interrogatories Nos. 5 and 12 at 13. But John Palombo, Metaswtich's 30(b)(6) witness on its knowledge of the '279 Patent, testified that Metaswitch never did any analysis of that patent:

> Q. (BY MR. BAXTER) The answer here says, "No analysis or evaluation of the '279 patent was performed" in connection with the e-mail thread in Exhibit 397. Do you know -- what I find unusual is it says, "No analysis or evaluation was performed in connection with this document, Exhibit 397." But my question is, do you know if MetaSwitch ever performed any analysis or evaluation of the '279 patent, whether it was in connection with Exhibit 397 or not?
> A. What do you mean by "analysis"?
> Q. (BY MR. BAXTER) Well, what do you understand analysis to mean?
> A. Well, analysis could be anything from reading a document to spending several months pouring over it to see how it applies to a particular situation.
> Q. Okay. And I would include all of that within the scope of analysis.
> A. And I guess, no, there was no analysis of that patent.

John Palombo Tr. at 26:21-27:15. Thus, there is no evidence of reliance even with respect to the '279 Patent.

[CL54] The findings of fact above also demonstrate that Metaswitch has not suffered any prejudice as a result of the filing of this lawsuit in 2014. There is no evidence that Metaswitch suffered any economic harm other than damages it would owe to Genband as a result of the allegedly infringing activity. The record, at best, consists only of conclusory allegations of economic prejudice.

## E. Equitable Defense: Implied License

### 1. Applicable Law

**[CL55]** "In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997). Implied license applies when a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted. *Id.* at 1581. The primary difference between an implied license and equitable estoppel is that to find an implied license there must have been an affirmative grant of consent or permission to make, use, or sell (i.e., a license). *Id.* "Equitable estoppel, on the other hand, focuses on 'misleading' conduct suggesting that the patentee will not enforce patent rights." *Id.*

**[CL56]** The Federal Circuit has endorsed a five-part test for determining whether a patentee impliedly licensed an invention to an accused infringer:

> (1) [T]here was an existing relationship between the patentee and infringer; (2) within that relationship the patentee transferred a right to use the patented invention to the [infringer]; (3) the right was transferred for valuable consideration; (4) the patentee has now denied the existence of the right; and (5) the patentee's statements and conduct created the impression that it consented to the accused infringer making, using, or selling the patented invention.

*Mass Engineered* Design*, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 388 (E.D. Tex. 2009). (citing *Wang*, 103 F.3d at 1579).

### 2. The Court concludes that Metaswitch has not proven by clear and convincing evidence that implied license bars Genband's damages.

**[CL57]** Based on the findings of fact and applicable legal standards discussed above, the Court finds that the doctrine of implied license does not bar Genband's recovery of damages, and Metaswitch's motion in this regard is **DENIED**.

**[CL58]**　　Metaswitch have provided no evidence that a relationship existed between it and Genband or Nortel, that Genband or Nortel transferred any rights to use the patented invention to Metaswitch, or that Metaswitch gave valuable consideration for such a transfer. Furthermore, Metaswitch cannot establish that Genband or Nortel's conduct created an impression that it consented to Metaswitch's use of the inventions for the same reasons that Defendants cannot establish equitable estoppel—prior to this litigation, Nortel and Genband did not communicate with Metaswitch about, and Metaswitch was unaware of, the '279, '561, '589, and '971 Patents.

**[CL59]**　　Moreover, Metaswitch has not shown an implied license or affirmative grant of consent or permission to make, use, or sell the patented invention. As described above, Nortel and Genband did not agree to license the '279, '561, '589, and '971 Patents through its SSO agreements. The fact that Nortel and Genband did not have obligation to license under express provisions of the SSO agreements undermines any finding of an implied license in this context.

## F.　　Patent Eligible Subject Matter under 35 U.S.C. § 101

### 1.　　Legal Standard

**[CL60]**　　Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law . . . ." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (en banc). There are three specific judicially recognized exceptions to patentable subject matter: laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Laws of nature and abstract ideas may not be patented because no one may claim their exclusive use. *Id.* at 609–10 ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.") (quoting *Gottschalk v.*

*Benson*, 409 U.S. 63, 67 (1972)). In other words, "one may not patent an idea." *Benson*, 409 U.S. at 71.

**[CL61]** To invalidate a claim because it does not claim eligible subject matter, the challenger must prove their case by clear and convincing evidence. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

**[CL62]** In *Alice v. CLS Bank*, the Supreme Court explained that not all abstract ideas are unpatentable because "[a]t some level, all inventions embody, use, reflect, rest upon, or apply . . . abstract ideas. 134 S.Ct. 2347, 2354 (2014). Thus an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* (internal citations omitted). An invention that merely *involves* an abstract concept "pose[s] no comparable risk of pre-emption, and therefore remain[s] eligible for the monopoly granted under our patent laws." *Id.* at 2355. Thus, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* at 2354 (internal citations omitted).

**[CL63]** The *Alice* Court described the use of a two-part test to determine whether a patent claims a patent-ineligible abstract idea. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012). First, the claim must be examined as a whole to determine whether it is directed to an abstract idea. *Alice*, 134 S. Ct. at 2355 n.3. Abstract ideas include "fundamental economic practice[s]," certain "method[s] of organizing human activit[ies]," an "idea of itself," and "mathematical formula[s]." *See id.* at 2355–56.

**[CL64]** Second, even if the claim is found to be directed to an abstract idea, it is still patent-eligible if it recites "an element or combination of elements . . . sufficient to ensure that

the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. at 2355 (internal quotation marks omitted); *see also DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). A patent claim can amount to "significantly more" than an abstract idea in a number of different ways, including by: (1) improving the functioning of a computer itself;[9] (2) improving a technology or technical field;[10] (3) applying the abstract idea with, or by use of, a particular (as opposed to generic) machine;[11] (4) effecting a transformation or reduction of a particular article to a different state or thing;[12] (5) adding steps that confine the claim to a particular useful application or adding a specific limitation other than what is well-understood, routine, and conventional in the field;[13] or (6) including other meaningful limitations beyond generally linking the use of the abstract idea to a particular technological environment[14].

[CL65] Significantly, the Supreme Court explained that "claims [that], for example, purport to improve the functioning of the computer itself" are not directed to abstract ideas. *Alice*, 134 S. Ct. at 2359. Indeed, the Federal Circuit held in *DDR Holdings* that the claims at issue recited patent eligible subject matter because they solved a technical problem using a technical solution—namely that "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer

---

[9] *Alice*, 134 S. Ct. at 2359.

[10] *Alice*, 134 S. Ct. at 2359 (citing *Diehr*, 450 U.S. at 177–78) (stating, *e.g.*, that "the claims in *Diehr* were patent eligible because they improved an existing technological process").

[11] *See Bilski*, 561 U.S. at 604 ("The Court's precedents establish that the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101.").

[12] *See Diamond v. Diehr*, 450 U.S. 175 at 184 (1981) ("That respondents' claims [to a specific rubber molding process] involve the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing cannot be disputed."); *see also Gottschalk v. Benson*, 409 U.S. 63 at 70 (1972) ("'Transformation and reduction of an article 'to a different state or thing' is the clue to the patentability of a process claim that does not include particular machines.")

[13] *Alice*, 134 S. Ct. at 2354, 2357–59.

[14] *Alice*, 134 S. Ct. at 2360.

networks." *DDR Holdings, LLC*, 773 F.3d at 1257. In addition, in *PNC Bank*, the Patent Trial and Appeal Board found that "transform[ing] data in a particular manner . . . to create formatted data" was not an abstract idea. *PNC Bank v. Secure Axcess, LLC*, CBM2014-00100, Paper 10, p. 20 (PTAB Sept. 9, 2014).

[**CL66**]   Furthermore, the law does not support a rule that the presence or absence of "concrete or material objects" defines the boundary between eligible and ineligible subject matter. Indeed, a claim implemented on an apparently "concrete" computer or storage medium may be patent ineligible  if it merely embodies an abstract idea, whereas an invention as immaterial as software is  potentially patent-eligible. *See In re Bilski*, 545 F. 3d 943, 960 n.23 (Fed. Cir. 2008) ("we decline to adopt a broad exclusion over software or any other such category of subject matter").

[**CL67**]   However, reference to generic, non-specific devices cannot confer patent-eligibility on otherwise unpatentable claims.  *See, e.g., Alice,* 134 S. Ct. at 2358 ("the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 & n.1 (Fed. Cir. 2014).

### 2.   '561 Patent Asserted Claims are Patent Eligible

[**CL68**]   Metaswitch has previously presented its § 101 ineligibility argument for the '561 Patent at the summary judgment stage, which the Magistrate Judge rejected:

> . . . Claim 12 of the '561 Patent is patent-eligible under § 101. The Court agrees with Metaswitch that Claim 12 is representative for purposes of the § 101 analysis; the other asserted claims of the '561 Patent are likewise patent-eligible.

Dkt. No. 408 at 18.

**[CL69]**    The Court also rejected Metaswitch's objections to the Magistrate Judge's ruling, and the Court adopted in full the report and recommendation of the Magistrate Judge. Dkt. No. 447.  Thus, the Court rejects Metaswitch's attempt to reargue § 101 ineligibility for the '561 Patent.

### 3.    '658 Patent Asserted Claims are Patent Eligible

**[CL70]**    The asserted claims of the '658 Patent are not invalid as they are directed to patent-eligible subject matter.

**[CL71]**    The claims of the '658 Patent are not directed to an abstract idea, and thus pass the first step of the *Alice* test and are patent eligible.

**[CL72]**    The fact that the asserted claims of the '658 Patent involve, in part, the manipulation of binary data or signals does not inherently render them abstract.  If that were the case, no claim drawn to a digital device could ever survive § 101.  Dkt. No. 408 at 13. The asserted claims are not merely a computerized implementation of an abstract concept or the implementation of a mathematical principle on a physical machine.  Moreover, the asserted claims of the '658 Patent "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but instead are "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014); *see, e.g.*, PX3 at 2:46–54, 4:34–42.

**[CL73]**    Claim 1 of the '658 Patent is not directed to an abstract idea, and it is neither drawn to the manipulation of binary data or signals nor "language translation" in any abstract way. Claim 1 is directed to specific technological components ("a first protocol agent," "a second protocol agent," and an "interworking agent") that work together in specific

ways to provide first and second "IP telephony device[s]" associated with first and second "IP telephony protocol[s]," respectively, the ability "to communicate with each other according to a third protocol," instead of merely the "first IP telephony protocol" or the "second IP telephony protocol." PX3 at Claim 1. Furthermore, the interworking agent, using the third protocol, provides specific "functions" that are "a super-set of functions provided by the first and second IP telephony protocols." The interworking agent also "communicat[es] . . . to the second protocol agent without alteration," "a first parameter associated with the first IP telephony protocol [that] does not map to the second IP telephony protocol." PX3 at Claim 1. Claim 1 recites these elements in the particular context of a "call server" that enables a first and second "IP telephony device," having a "first IP telephony protocol" and a "second IP telephony protocol," respectively, to communicate with each other in the specific manner claimed. PX3 at Claim 1.

[CL74]  Claim 11 is similar to Claim 1, but differs, for example, in that it is a method claim with four steps. Claim 11 also recites that a "second message includ[es] at least one of a media capabilities description and media stream management information [is] derived from" "a first message formatted according to a first IP telephony protocol," and that "a third message [is generated] according to a third IP telephony protocol" "in response to receiving the second message," where the third message "includ[es] at least one of the media capabilities description and media stream management information derived from the second message." PX3 at Claim 11. Claim 11 further deals, *inter alia*, with a particular method "for interworking devices that communicate using different internet protocol (IP) telephony protocols," and further with a particular way of interworking media capabilities description and media stream management information between different telephony devices that may use different "IP telephony protocol[s]." PX3 at Claim 11.

**[CL75]** The asserted claims of the '658 Patent are **not** directed to the abstract idea of communicating between two entities that speak a different language by using a middle man that can understand both languages. This characterization is inaccurate because it describes a typical translator (a third person) who translates from one language to a second language and vice versa. In contrast, the asserted claims recite interworking via a common third protocol (e.g. a third language in the analogy - not a third party translator), where protocol agents (e.g., translators) map parameters from the first and second IP protocols to and from the common third protocol. Such interworking does not arise in the brick and mortar context, but rather in the realm of computer networks.

**[CL76]** Asserted Claims 1 and 11 are not directed to an abstract idea. The claims attempt to "overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257. For example, the utility associated with the claimed call server and method is specific to the context recited in the claims, for example, as stated in Claim 11—the need to "interwork[] devices that communicate using different internet protocol (IP) telephony protocols." PX-3 at Claim 11; *see also* PX-3 at Claim 1, 2:42–62, 4:34–42, 6:22v37, 6:65–7:53, 8:52–9:30 (describing the problem of communicating between equipment that uses various different IP telephony protocols, and positing the invention as a solution to this problem—for example, via using an interworking agent and interworking protocol, communicating media capabilities description and/or media stream management information, and sending parameters that do[] not map without alteration). Without the inventions described in the asserted claims of the patent, efficient communication between IP devices that use various different protocols would be difficult or even nonexistent in certain situations. *See, e.g.*, PX-3 at 2:42–62. This is not a case in which an abstract idea or mathematical principle is carried out on a computer—

the recited components and operations are meaningless outside the context of a computer network that uses specific types of IP telephony devices, IP telephony protocols, protocol agents, and interworking agents, and that sends specific types of data (e.g., media capabilities description and media stream management information).  *Compare Mayo*, 132 S. Ct. at 1301 *with DDR*, 773 F.3d at 1257; *see also* '658 Patent at Claims 1, 11, 2:22–62 (discussing "interworking between" real-time "IP telephony protocols" such as H.323, MGCP, Megaco/H.248, and Session Initiation Protocol (SIP)).

[CL77]    In addition, the claims of the '658 Patent do not represent an attempt to capture a "building block[] of human ingenuity," "a method of organizing human activity," a "fundamental truth," an "idea of itself," or the like. *See Alice*, 134 S. Ct. at 2354–56.  The claims of the '658 Patent, like the claims at issue in DDR, address a problem "specifically arising in computer networks," that "does not arise in the 'brick and mortar' context." *DDR*, 773 F.3d at 1257–58. For example, the claims deal with specific problems that arise in specific computer networks—for example, IP communications between different IP telephony devices using first and second IP protocols via the implementation of specific components (*e.g.*, protocol agents and an interworking agent) that perform specific functions (*e.g.*, implementing a specific third protocol that operates in multiple specific ways, or the specific handling of particular data—such as media capabilities description and media stream management information).  PX3 at Claims 1, 11.

[CL78]    Furthermore, the components of the claims are not abstract but rather specific components that have a concrete nature and perform specific functions within a network.  For example, "protocol agents" and "interworking agents," as recited in the claims, can be implemented in the form of hardware and/or software.  *See, e.g.*, PX3 at 4:65–5:61 (describing

some example functionality of the protocol agents and interworking agent and that they can be located on different machines—for example, "[t]he division of the interworking agent into two software components allows protocol agents associated with a given call to execute on separate machines").  Moreover, the "IP telephony device[s]" recited in the claim are specific hardware devices with particular circuitry.

**[CL79]**    The asserted Claims cannot be performed by the human hand or in the human mind without the need for specific hardware or circuitry, at least because (1) Claim 1 recites specific components of a call server and (2) Claims 1 and 11 recite their limitations in the context of "IP telephony" devices, protocols, and communications, which communicate in real-time.  A human cannot, for example, successfully interwork between IP telephony protocols during a real-time audio call.

**[CL80]**    Even if the asserted claims could be fairly characterized as being directed to an abstract idea, the claim is patent-eligible because it recites "an element or combination of elements . . . sufficient to ensure that the patent in practice  amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355. The asserted claims thus also pass the second step of the Alice test and are therefore patent eligible on this basis as well.

**[CL81]**    Claim 1 recites a "call server" comprising a first and second "internet protocol (IP) telephony device" associated with a first and second "IP telephony protocol," as well as a first and second "protocol agent" for communicating with the first and second "IP telephony device[s]."  Claim 1 further recites an "interworking agent" that allows the first and second "protocol agents to communicate with each other according to a third protocol," and the claim delineates the context in which the third protocol is used and how the interworking agent handles parameters in certain situations ("the functions provided by the third protocol [are] a super-set of

functions provided by the first and second IP protocols," and the "interworking agent" "communicat[es] . . . to the second protocol agent without alteration," "a first parameter associated with the first IP telephony protocol [that] does not map to the second IP telephony protocol"). PX3 at Claim 1. Hence, Claim 1 recites a specific "call server" that is a non-generic computer system (and that recites other non-generic computer systems as claim elements), and that "improve[s] the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359. For this same reason, Claim 1 passes the machine-or-transformation test—it recites machines (IP telephony devices, protocol agents, interworking agents, a call server) that "impose a meaningful limit on the scope of a claim" by "play[ing] a significant part in permitting the claim[] . . . to be performed." *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). Furthermore, Claim 1 "is tied to a particular machine or apparatus" and thus passes the machine or transformation test. *In re Bilski*, 545 F.3d at 954.

**[CL82]** Similar to Claim 1, Claim 11 also recites "significantly more" than an abstract idea. For example, it is a method claim with four steps and recites, *inter alia*, a particular method "for interworking devices that communicate using different internet protocol (IP) telephony protocols," and further a particular way of interworking media capabilities description and media stream management information between different telephony devices that may use different "IP telephony protocol[s]." Specifically, Claim 11 recites, "generating a second message including at least one of a media capabilities description and media stream management information derived from" "a first message [received from a first telephony device] formatted according to a first IP telephony protocol." Claim 11 further recites "transmitting the second message to a second protocol agent" and, in response, "generating a third message formatted according to a third IP telephony protocol," where the third message "includ[es] at least one of the media capabilities

description and media stream management information derived from the second message." PX3 at Claim 11. Claim 11 also delineates the context in which the steps are performed, for example, in the context of "interworking devices that communicate using different internet protocol (IP) telephony protocols." Hence, Claim 11 is implemented in the context of a non-generic computer system, and "improve[s] the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359. For this same reason, Claim 11 passes the machine-or-transformation test; it recites machines (e.g., a "telephony device" associated with an "IP telephony protocol" and a "protocol agent") that "impose a meaningful limit on the scope of a claim" by "play[ing] a significant part in permitting the claimed method to be performed." *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). Indeed, these machines are the only reason one would perform the claimed method in the first place. Furthermore, Claim 1 "is tied to a particular machine or apparatus" and thus passes the machine or transformation test. *In re Bilski*, 545 F.3d at 954.

[CL83]   The opinions of Genband's expert, Mr. Lanning, further confirm that the asserted claims of the '658 patent are patent-eligible under Section 101. *See* May 29, 2015 Lanning Validity Report, App. 6 at ¶¶ 223–26. For example, Mr. Lanning explained that the claims are directed to overcome a specific problem in the IP telephony field. *Id.* He further explained that the claims solve a particular problem and allow two Internet Protocol devices to communicate in a particular way (e.g., via the specific interaction of particular IP telephony devices, protocol agents, and an interworking agent). *Id.* For example, Claims 1 and 11 both recite devices that communicate using different IP telephony protocols and protocol agents that communicate with those IP telephony devices. PX3 at Claims 1 and 11. Further, Mr. Lanning opines that the claims require particular hardware components with particular circuitry for performing certain functions.

**[CL84]**   For at least the reasons stated above, the asserted claims of the '658 Patent are not directed to a patent-ineligible abstract idea.  The asserted claims of the '658 patent also recite significantly more than an abstract idea.

**[CL85]**   Thus, the asserted claims of the '658 Patent are patent eligible under 35 U.S.C. § 101. Metaswitch's motion to find the patents-in-suit to be directed at patent-ineligible subject matter is **DENIED**.

So ORDERED and SIGNED this 29th day of September, 2016.

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE